UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LETICIA ZUNIGA ESCAMILLA,                                  CIVIL NO. 09-2120 (ADM/JSM)

　　　　Plaintiff,

v.                                                                              ORDER

SMS HOLDINGS CORPORATION,
SERVICE MANAGEMENT SYSTEMS, INC.,
and MARCO GONZALEZ,

　　　　Defendants.


JANIE S. MAYERON, U.S. Magistrate Judge.

The above matter came on before the undersigned upon Defendant Marco Gonzalez's First Amended Motion to Compel and Extend Time Period and for Protective Order [Docket No. 202]; Plaintiff's Motion to Compel Electronically-Stored Information and Other Discovery [Docket No. 211]; Defendants' Motion to Strike Plaintiff's Motions [Docket No. 216]; Plaintiff's Motion to Compel Production of Documents Listed on the Privilege Log of Defendants Service Management Systems, Inc. and SMS Holdings Corporation [Docket No. 276]; Defendant Marco Gonzalez's Motion to Compel Discovery and Extend the Time Period for Deposing Daniel Peralta [Docket No. 326]; Plaintiff's Motion to Compel and for Spoliation Sanctions [Docket No. 331]; and Plaintiff's Motion for Extension of Time to File Memorandum [Docket No. 334].

Lisa C. Stratton, Esq., Jill R. Gaulding, Esq., and Jonathan J. Dahl, Esq. appeared on behalf of plaintiff; C. Eric Stevens, Esq. appeared on behalf of SMS Holdings Corporation and Service Management Systems, Inc. ("SMS"); Kurt J. Erickson,

1

Esq., appeared on behalf of defendant Marco Gonzalez; and Thomas Pursell, Esq., appeared on behalf of the Immigrant Law Center of Minnesota

The Court, being duly advised in the premises, upon all of the files, records, and proceedings herein, and for the reasons stated on the record at the hearing and in the Memorandum below, now makes and enters the following Order.

IT IS HEREBY ORDERED that:

1.     Defendant Marco Gonzalez's First Amended Motion to Compel and Extend Time Period and for Protective Order [Docket No. 202] is **GRANTED** in part and **DENIED** in part as set forth in the Memorandum below;

2.     Plaintiff's Motion to Compel Electronically-Stored Information and Other Discovery [Docket No. 211] is **GRANTED** in part and **DENIED** in part as set forth in the Memorandum below;

3.     Defendants' Motion to Strike Plaintiff's Motions [Docket No. 216] is **DENIED**;

4.     Plaintiff's Motion to Compel Production of Documents Listed on the Privilege Log of Defendants Service Management Systems, Inc. and SMS Holdings Corporation [Docket No. 276] is **GRANTED** in part and **DENIED** in part as set forth in the Memorandum below;

5.     Defendant Marco Gonzalez's Motion to Compel Discovery and Extend the Time Period for Deposing Daniel Peralta [Docket No. 326] is **GRANTED** for the reasons stated forth on the record at the hearing as follows:

      a.     Defendant's motion for an extension of time to take the deposition of Daniel Peralta is **GRANTED**. Defendant Marco Gonzalez shall have until the end of fact discovery in this case to take the

deposition Daniel Peralta.   Fact discovery will be extended by separate amended pretrial scheduling order, to be issued, given the relief afforded by this Order.

b.     The requirements set forth by this Court's October 29, 2010 Order [Docket No. 271], p. 3, as it relates to subpoenaing and deposing Daniel Peralta, shall remain in place.

c.     Defendant's request that plaintiff's counsel be required to make any inquiry with Daniel Peralta as to his address is **DENIED**.

6.     Plaintiff's Motion to Compel and for Spoliation Sanctions [Docket No. 331] is **GRANTED** in part and **DENIED** in part as set forth in the Memorandum below;

7.     Plaintiff's Motion for Extension of Time to File Memorandum [Docket No. 334] is **GRANTED**; and

8.     On or before July 11, 2011, the parties shall submit a proposal for revising the current Pretrial Scheduling Order.

Dated:        June 28, 2011              *s/ Janie S. Mayeron*
                                         JANIE S. MAYERON
                                         United States Magistrate Judge

## MEMORANDUM

I.   **DEFENDANT MARCO GONZALEZ'S FIRST AMENDED MOTION TO COMPEL AND EXTEND TIME PERIOD AND FOR PROTECTIVE ORDER [DOCKET NO. 202]**

The only issue remaining as to Defendant Marco Gonzalez's First Amended Motion to Compel and Extend Time Period and for Protective Order was Gonzalez's motion to compel the Immigration Law Center and Cynthia Anderson to produce communications withheld based on the attorney-client and work product privileges.  See October 29, 2010 Order [Docket No. 271].

The Immigration Law Center of Minnesota ("ILCM") provides pro bono legal representation to Minnesota immigrants in matters of adjustments to status, citizenship, deportation defenses, U-Visas for those who have been the victims of violent crimes, matters falling under the Violence Against Women's Act and other immigration proceedings.  See Declaration of ILCM Executive Director John Keller ("Keller Decl.") [Docket No. 264], ¶ 1, Ex. 1.  The ILCM practices before the United States Citizenship and Immigration Service ("USCIS"), the Executive Office of Immigration Review, the Board of Immigration Appeals ("BIA") and before federal courts.  Id., ¶ 1. The ILCM is a recognized organization under 8 C.F.R § 292.2, authorized to designate BIA "Accredited Representatives" to practice before the USCIS and the BIA.  Id.   The staff of the ILCM includes ten attorneys, a law graduate, a contract attorney and Cynthia Anderson ("Anderson"), a paralegal specialist who is an Accredited Representative designated under 8 C.F.R § 292.2(d) and thereby authorized to represent clients before the USCIS and the BIA.  Id., ¶¶ 1, 3.  Upon first contact with clients, the ILCM stresses that client communications will be held in confidence.  Id., ¶ 5.

Plaintiff Leticia Zuniga Escamilla ("Zuniga") represented that she went to the ILCM in order to seek legal advice regarding her immigration status.  See Declaration of Leticia Zuniga Escamilla in Opposition to Defendant Gonzalez's Motion to Compel ("Zuniga Decl.") [Docket No. 231], ¶ 2.  Zuniga first went in the ILCM in March 2008. Zuniga stated that she believed that Anderson was an attorney, and that it was her understanding that Anderson was going to gather all of the necessary information regarding her case and study the information.  Id.  During their first meeting, Anderson told Zuniga that her husband could not be present during their meeting because all of

4

the information that Zuniga provided to Anderson would be confidential.   Id., ¶ 3.  As a result, Zuniga's husband did not attend any of the meetings with her at the ILCM, and she understood that her communications with Anderson were confidential.   Id.   In addition, Zuniga stated that it was her understanding that Anderson would keep everything that Zuniga told her in confidence and that any documents brought to Anderson for review was all attorney-client information.  Id., ¶¶ 4, 5.

On October 8, 2008, Zuniga signed a formal ILCM representation agreement. Anderson testified at her deposition that attorney Lonore Millibergity ("Millibergity"), supervised her during her representation of Zuniga, and that this information concerning supervision would have been information contained in the ILCM retainer agreement with Zuniga.  See Declaration of Kurt J. Erickson in Support of Motion to Compel Discovery ("Erickson Compel Decl.") [Docket Nos. 181, 182], Ex. K (Anderson Dep.), pp. 20-21. Concerning Millibergity's involvement in Zuniga's case, Anderson testified, "probably within one to two weeks of talking with the client.  Typically we are able to do case reviews either weekly, or if there is there's a conflict, after a couple of weeks. . . ."  Id., p. 31.  Millibergity represented in her affidavit that she was a supervising attorney in 2008 and that it was, and still is, the practice of the ILCM that attorneys and accredited representatives review new cases to determine which cases to accept.   Id., Ex. M (Affidavit of Lonore Millibergity), ¶ 2.  In addition, Millibergity represented that while she did not remember Zuniga's case, her practice was that she would have reviewed and discussed the case with Anderson within a week of in-take.  Id.

Anderson testified that the formal representation of Zuniga began in October 2008, when the ILCM decided to represent her regarding a U-Visa,[1] but that conversations occurring before October amounted to a legal consultation to gather information to determine whether Zuniga had a viable immigration claim.  Id., Ex. K (Anderson Dep.), pp. 24-25, 29-30.  Anderson also stated that she believed Zuniga was seeking legal advice when she first came to the ILCM in March 2008.  Id., pp. 80-81. Anderson filed Zuniga's U-Visa application, which was granted, and no appeal was ever required to obtain the visa.  Id., pp. 70-72.

On July 2, 2010, Gonzalez subpoenaed documents from the ILCM relating to Zuniga.  On September 21, 2010, the ILCM produced some documents and a privilege log to Gonzalez, which listed documents withheld from its production in response to a subpoena duces tecum.  See Declaration of Kurt J. Erickson in Support of First Amended Motion to Compel Discovery and Extend Period and for Protective Order [Docket No. 206] ("Erickson 2nd Compel Decl."), Ex. I (Sept. 10, 2010 Letter and attached Privilege Log from ILCM); see also Declaration of Thomas Purcell [Docket No. 266] ("Purcell Decl."), Ex. 2 (Privilege Log).

Gonzalez's motion to compel seeks an order compelling Anderson and the ILCM to provide information on Zuniga's communications with them until the October 2008 representation agreement between Zuniga and the ILCM was signed.  See Docket No. 202.  Gonzalez maintained that it was unlikely that any attorney-client relationship

---

[1]    In order for an alien to receive a U-Visa, she must establish that she "suffered substantial physical or mental abuse" as a result of having been the victim of certain specified crimes set out in the statute and that the alien has been helpful or is likely to be helpful in investigating specific criminal activity.  See 8 U.S.C. § 1101(a)(15)(U)(i)(I),(iii); 8 U.S.C. § 1184(p)(1).

existed between the first time Zuniga met with the ILCM in March 2008 and October 7, 2008, when the representation agreement was signed. <u>See</u> Defendant Marco Gonzalez's Memorandum of Law in Support of Motion to Compel Discovery [Docket No. 180] ("Gonzalez Compel Mem."), p. 17.

Furthermore, Gonzalez claimed:

- Nothing in the information provided by the ILCM's privilege log contradicted the Affidavit of Lenae Millibergity, which provided that there was no attorney oversight of Anderson with regards to Zuniga's immigration file. <u>See</u> Defendant Marco Gonzalez's Supplemental Memorandum of Law in Support of First Amended Motion to Compel Discovery and Extend Period and for Protective Order ("Gonzalez's Supp. Mem.") [Docket No. 204], p. 7.

- Communications between a client and an accredited representative do not enjoy the protections afforded by the attorney-client privilege. <u>See</u> Gonzalez's Supp. Mem., p. 7 (citing <u>United States v. Arango-Chairez</u>, 875 F. Supp. 609 (D. Neb. 1994)).

- The documents listed on the privilege log should be produced as the log provided by Anderson and the ILCM did not provide information showing confidential and privileged communications being made regarding legal advice or how the documents were generated in anticipation of litigation. <u>Id.</u>, pp. 7-8.

- This Court should not consider Zuniga's affidavit asserting her belief regarding her legal representation by Anderson and the ILCM because it was not timely and was not produced as soon as it was signed.

- Any privilege between Zuniga and the ILCM has been waived because she has placed her immigration status at issue. <u>See</u> Gonzalez Compel Mem., p. 17, pp. 18-19.

The ILCM countered that the attorney-client privilege attaches to the communications in the privilege log because Anderson is an agent to a supervising

lawyer at the ILCM.  See ILCM's Memorandum in Opposition to Defendant Gonzalez's Motion to Compel Discovery from Immigrant Law Center of Minnesota and Cynthia Anderson ("ILCM Mem.") [Docket No. 261], p. 7.  The ILCM also argued that the privilege should attach to the communications between Anderson and Zuniga, as Anderson is empowered by federal law to represent clients in immigration proceedings. Id., pp. 7-8.  Without the privilege, immigrants seeking legal advice on immigration issues would not feel free to share sensitive information with accredited representatives, thereby compromising the ILCM's ability to represent clients before immigration tribunals.  Id., p. 8.

### A.   Request to Strike Zuniga's Declaration

Gonzalez's request that the Court strike Zuniga's statement that was submitted by both the Zuniga and the ILCM to support the invocation of the attorney-client privilege and work product doctrine, on grounds that it was not timely and because it was not produced as soon as it was signed, is denied.  The genesis of Zuniga's Declaration [Docket No. 231], is that it was served on September 30, 2010 at 12:42 a.m. Pursuant to this Court's September 16, 2010 Order [Docket No. 201], Zuniga's response to Gonzalez's motion to compel, including the Declaration, should have been filed on September 29.  Per the explanation of Zuniga's attorney, she started filing at 11:30 p.m. on September 29, however, it took longer to complete the filing than anticipated.  Zuniga's Declaration was again submitted by the ILCM on October 7, 2010. See Docket No. 263.  The ILCM was not covered by this Court's September 16, 2010 Order.  While Zuniga's counsel would be well advised to not leave the filing of pleadings until the very last minute, Gonzalez's hypertechnical argument about the timing is

unavailing given that Gonzalez has not set forth any evidence that he was prejudiced because he did not receive the declaration at 11:59 p.m. versus 12:49 a.m.   In any event, the ILCM's filing of the statement on October 7 was timely as its submissions were not governed by September 16, 2010 Order.   The Court also rejects Gonzalez's argument that the declaration should be stricken because it was dated September 17, 2010 and was not filed or produced by Zuniga until September 29, 2010.   This declaration was generated for the purpose of responding to the motion to compel and therefore does not fall with the ambit of Rule 26 of the Federal Rules of Civil Procedure. Regardless, this Court finds no harm to Gonzalez as a result of the twelve-day delay from the date of the signing of the affidavit to its filing.

For all of the reasons stated above, the Court has considered Zuniga's September 17, 2010 declaration and will not strike it.

## B.    When the Privilege Attaches

Gonzalez challenged the attachment of any privilege prior to October 7, 2008, the date when the representation agreement was signed between Zuniga and ILCM.

This Court finds that the privilege attaches to preliminary discussions about representation between a legal adviser and prospective client, regardless of whether formal representation is ultimately undertaken.   See Sandoval v. American Bldg. Maintenance Industries, Inc., 267 F.R.D. 257, 273 (D. Minn. 2007) (citing In re Auclair, 961 F.2d 65, 69 (5th Cir. 1992), citing McCormick on Evidence, § 88 (Cleary 3d ed. 1984); Lonegan v. Hasty, 436 F. Supp.2d 419, 435 n. 8 (E.D.N.Y. 2006).   Without this protection, an individual's ability to seek legal advice would be constrained, as they would not feel safe approaching an attorney about a possible case.   Here, Anderson

testified at her deposition that communications between her and Zuniga occurring before October constituted a legal consultation during which information was being gathered to determine whether Zuniga had a viable immigration claim.  See Erickson Compel Decl., Ex. K (Anderson Dep.), pp. 24-25, 29-30.   Gonzalez provided no evidence to the contrary.  As such, the Court will not withhold a designation of a privilege of documents generated prior to October 2008 merely because they were created prior to the formal retention agreement.

### C.   Applicability of Privilege to Anderson

"Due to the myriad complexities of modern litigation, attorneys and clients often rely on agents during the course of legal representation. Their dialogue sometimes achieves attorney-client status. To qualify for protection, statements to and from third parties must 'be made in confidence for the purpose of obtaining legal advice from the lawyer.'" HPD Laboratories, Inc. v. Clorox Co., 202 F.R.D. 410, 414 (D.N.J. 2001) (quoting United States v. Kovel, 296 F.2d 918, 922 (2d Cir. 1961)); see also E.I. du Pont de Nemours & Co. v. MacDermid, Inc., Civil Action No. 06-3383 (MLC), 2009 WL 3048421 at *3 (D.N.J. Sept. 17, 2009) (same).

In this case, the evidence before the Court showing that any attorneys were involved with Zuniga's U-Visa application is muddy.  See Declaration of Cynthia Anderson in Opposition to Defendants' Motion to Compel Discovery from Immigrant Law Center of Minnesota and Cynthia Anderson [Docket No. 265], ¶ 2 ("I handled a successful U-Visa application for Leticia Zuniga.  After being subpoenaed to testify for a deposition in this matter I reviewed the file, which I alone compiled.") (emphasis added). It was Anderson who first met with Zuniga; it was Anderson who collected the needed

10

information; and it was Anderson who submitted the U-Visa application. See HPD Laboratories, Inc., 202 F.R.D. at 414-415 (concluding that obtaining legal advice from a paralegal in of itself does not trigger the protections of the attorney-client privilege); see also John Labatt Ltd. v. Molson Breweries, 898 F. Supp. 471, 477 (E.D. Mich. 1995) (concluding that the attorney-client privilege did not apply to a legal employee who did not act as a conduit to and from counsel).   While it was practice at the ILCM for attorneys to review a case, there is no clear evidence before the Court to suggest the nature and extent of any attorney involvement in Zuniga's case.   Indeed, Anderson's supervising attorney, Millibergity, testified that she could not remember Zuniga's case, although it was her practice to review and discuss such cases with Anderson within a week of in-take.  See Erickson Compel Decl., Ex. L (Affidavit of Lonore Millibergity), ¶ 2.

On the other hand, Anderson is an accredited representative designated under 8 C.F.R § 292.2(d), which provides that such a person is "accredited to practice before the [Immigration and Naturalization] Service alone or the Service and the Board [of Immigration Appeals] (including practice before immigration judges)."   Applicants who are denied a U-Visa may appeal the denial to the Administrative Appeals Office pursuant to the provisions of 8 C.F.R. § 103.3, which contemplates that such appeals may be filed by an accredited representative.  See 8 C.F.R. § 103.3(a)(1)(v); 8 C.F.R. § 214.14(c)(5)(ii).  Accredited representatives are governed by the rules of professional conduct and have knowledge of immigration laws and procedures that are related to furthering the interests of aliens and the government in immigration proceedings.  See Final Rule: Professional Conduct for Practitioners—Rules and Procedures, 65 Fed. Reg. 39,513, 39,514-15 (June 27, 2000); Final Rule: Professional Conduct for

Practitioners—Rules and Procedures, and Representation and Appearances, 73 Fed. Reg. 76,914, 76,915 (Dec. 18, 2008); 8 C.F.R. § 1003.0(e)(1), (2)(iii).

Gonzalez cites to <u>United States v. Arango-Chairez</u>, 875 F. Supp. 609 (D. Neb. 1994), <u>aff'd</u> <u>by</u> 66 F.3d 330 (8th Cir. 1995) (Table Decision), for the proposition that the attorney-client privilege does not attach to communications between an Accredited Representative and a client.   In <u>Arango-Chairez</u>, the government called in a criminal matter a witness who was an "accredited representative" assigned to represent the defendant at his deportation hearing.   <u>Id.</u> at 612.   The court characterized the accredited representative as having the "duty to serve as defendant's (and other detainees') attorney-in-fact," in dealing with immigration matters, which in that case dealt with deportation.   <u>Id.</u> at 612-13.   The defendant challenged calling the accredited representative as a witness on the basis that the information sought was protected by the attorney-client privilege.   <u>Id.</u> at 613 n. 3.   The court rejected the application of the privilege, as the defendant was not even aware that a legal professional was present. <u>Id.</u>

<u>Arango-Chairez</u>, is inapposite to this case where Zuniga has represented that she went to the ILCM in order to seek legal advice regarding her immigration status; she believed that Anderson was an attorney; during her first meeting she was told that her husband could not attend because the information provided by her would be confidential; and it was her understanding that all information produced was protected from disclosure.   <u>See</u> Zuniga Decl., ¶¶ 2-4.   While the "existence of an attorney client relationship is not dependent upon the payment of fees or the execution of a formal contract; rather, a professional relationship for purposes of attorney-client privilege

'hinges upon the client's belief that he is consulting a lawyer in that capacity and has manifested intention to seek professional legal advice' . . . an individual's mere 'subjective belief' that he is represented is not sufficient to demonstrate the existence of an attorney-client relationship . . . absent a 'relatively clear' by the potential client to the attorney that he believed he was being individually represented." Bible Faith Lutheran Church of India, Inc. v. Association of Free Lutheran Congregations Mission Corp., NO. CV 4-90-424, 1991 WL 1301309 at *1 (D. Minn. March 05, 1991) (citing and quoting United States v. Keplinger, 776 F.2d 678, 701 (7th Cir. 1985); Westinghouse Electric Corp., v. Kerr-McGee Corp., 580 F.2d 1311, 1317, 1319 (7th Cir. 1978), cert. denied, 439 U.S. 955 (1978), citing McCormick on Evidence, § 88, p. 179 (2nd ed. 1972)). Here, Zuniga's belief that she was being represented by Anderson as a lawyer was supported by her testimony that she met with Anderson to obtain legal advice and out of the presence of her husband, she provided Anderson with sensitive information, and placed her application for a U-Visa in the hands of Anderson.

Further, the application of a privilege in this case is supported by the fact that federal regulations authorize the use of accredited representatives, subject to rules of professional conduct, to represent aliens in immigration proceedings.  Other courts in examining the role of agents or advocates endowed with authority, pursuant to state or federal law, to be involved with legal matters, have extended a privilege to communications between a client and those advocates.  See, e.g., Polyvision Corp. v. Smart Techs. Inc., No. 03-476, 2006 WL 581037 at *3 (W.D. Mich. Mar. 7, 2006) (finding that a privilege applies to registered non-attorney patent agents for the purpose of presenting and prosecuting patent applications before United States Patent and

Trademark Office), <u>Mold-Masters Ltd. v. Husky Injection Molding Sys., Ltd.</u>, No. 01-1576, 2001 WL 1268587 at *4-5 (N.D. Ill. Nov.15, 2001) (same); <u>John Labatt Ltd. v. Molson Breweries</u>, 898 F. Supp. 471, 474-75 (E.D. Mich. 1995) (same); <u>Woods on Behalf of T.W. v. New Jersey Dept. of Educ.</u>, 858 F. Supp. 51, 55 (D.N.J. 1993) (applying the lay advocate privilege to conversations between parents and their advocate where the advocate was authorized by state law to advise and appear on behalf of parents in administrative law matters dealing with special education); <u>Vernitron Med. Prods., Inc. v. Baxter Labs., Inc.</u>, 186 U.S.P.Q. 324, 325 (D.N.J. 1975) (in finding that a privilege applies to patent agents, as the "substance of the function, rather than the label given to the individual registered with the Patent Office, controls the determination. . ."); <u>but</u> <u>see</u>, <u>Agfa Corp. v. Creo Prods.</u>, Inc., No. 00-10836, 2002 WL 1787534 at *2-3 (D. Mass. Aug. 1, 2002) (finding that communications to a non-attorney patent agent are not protected by the attorney-client privilege, unless made for purpose of obtaining legal advice from an attorney); <u>Gorman v. Polar Electro, Inc.</u>, 137 F. Supp.2d 223, 227 (E.D.N.Y. 2001) (applying the privilege to communications with non-attorney patent agents only when the agents act under the authority and control of counsel).  As the court in <u>In re Ampicillin Antitrust Litigation</u>, 81 F.R.D. 377 (D.D.C 1978) concluded:

> Congress, in creating the Patent Office, has expressly permitted both patent attorneys and patent agents to practice before that office. The registered patent agent is required to have a full and working knowledge of the law of patents and is even regulated by the same standards, including the Code of Professional Responsibility, as are applied to attorneys in all courts.  Thus, in appearance and fact, the registered patent agent stands on the same footing as an attorney in proceedings before the Patent Office. Therefore, under the congressional scheme, a client may

> freely choose between a patent attorney and a registered patent agent for representation in those proceedings. That freedom of selection, protected by the Supreme Court in <u>Sperry</u>, would, however, be substantially impaired if as basic a protection as the attorney-client privilege were afforded to communications involving patent attorneys but not to those involving patent agents. As a result, in order not to frustrate this congressional scheme, the attorney-client privilege must be available to communications of registered patent agents.

81 F.R.D. at 393 (citations omitted).

Congress, through the regulations enacted by the USCIS, has created a system where an immigrant may utilize an attorney or an accredited representative to represent them in matters falling before the jurisdiction of the USCIS.  The ability to proceed with representation using an accredited representative would be severely hampered if the conversations between these individuals were not protected from discovery.  This is especially true in the immigration context, where sensitive information regarding an alien's ability to stay in the United States is disclosed.  If clients are unsure of their legal status, they will be much less likely to confide in an accredited representative if those communications are subject to discovery.  As such, finding that no privilege exists between accredited representatives and aliens in the immigration context would frustrate the regulatory scheme set forth by the USCIS.  "Whenever applicable law limits the performance of essentially legal functions to individuals specifically authorized to that end, the underlying basis for the privilege . . . must be given its natural effect." <u>Vernitron Med. Prods., Inc.</u>, 186 U.S.P.Q. at 326.

For all these reasons, this Court concludes that because Zuniga believed that she was being represented by an attorney during the U-Visa process and because Anderson is an accredited representative authorized by federal law to practice in

15

administrative legal immigration proceedings, communications between Anderson and Zuniga, for the sole purpose of receiving legal advice in the immigration context, are privileged.

**D.    Applicability of the Attorney-Client Privilege or the Work-Product Doctrine to Withheld Documents**

The ILCM has provided to this Court all the documents on its privilege log for an in camera inspection.  The Court concludes that item 1 on the privilege log is a July 16, 2008 letter from Anderson to Zuniga, notifying Zuniga of the status of Anderson's investigation regarding U-Visa application, and what Zuniga needed to do in order to complete the application.  This Court finds that this letter is a communication between Anderson and Zuniga pertaining to providing legal advice on Zuniga's U-Visa application and is therefore, precluded from discovery based on the attorney-client privilege.

Item 2 is a checklist filled out by Anderson regarding Zuniga's U-Visa application and Item 3 is a memorandum authored by Anderson providing an overview of Zuniga's case.  According to the privilege log, these documents are protected from disclosure under the work product doctrine.  See Declaration of Thomas F. Pursell in Opposition to Defendant's Motion to Compel Discovery from Immigration Law Center and Cynthia Anderson ("Pursell Decl.") [Docket No 266], Ex. 2 (ILCM Privilege Log).  Anderson represented that these documents reflect her evaluation of the case.  See Anderson Decl., ¶ 2(b).  Gonzalez argued that Anderson or the ILCM did not set forth in the privilege log how these documents were generated in the anticipation of litigation.  See Gonzalez's Supp. Mem., p. 7.

The Federal Rules of Civil Procedure provide that, "[o]rdinarily, a party may not discover documents . . . <u>that are prepared in anticipation of litigation</u> . . . by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A) (emphasis added) The test for determining whether a document was prepared in anticipation of litigation is

> [W]hether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation.

<u>Simon v. G.D. Searle & Co.</u>, 816 F.2d 397, 401 (8th Cir. 1987).

This Court does not understand how a checklist for applying for a U-Visa was generated in anticipation litigation. There is no evidence that the application process is adversarial in nature or that any litigation was contemplated when the application was being contemplated or assembled. <u>See</u> <u>generally</u>, <u>In re Rail Freight Fuel Surcharge Antitrust Litigation</u>, 268 F.R.D. 114, 117 (D.D.C. 2010) (citations omitted) ("Courts have found patent application proceedings, which are <u>primarily ex parte in nature</u>, do not constitute litigation because they are not adversarial in nature.") (emphasis added); <u>Probert v. The Clorox Company</u>, 258 F.R.D. 491, 497 n. 7 (D. Utah 2009) ("A patent application is not prepared in anticipation of litigation." (citing <u>Intervenor v. U.S.</u>, 156 F.3d 1038, 1042 (10th Cir. 1998)) (marks omitted). Perhaps a claim of anticipation of litigation could come into play if Zuniga's application was denied and she had appealed the decision. However, Zuniga's application in this case was granted. As

such, this Court finds that under the facts of this case, the U-Visa checklist was not generated in anticipation of litigation and it is not protected by the work-product doctrine.

As for Item 3, which ILCM withheld on the basis of the work product doctrine, this document is an overview of communications between Zuniga and Anderson regarding proceeding with a U-Visa application.   While this document contains information concerning other legal matters, it was not generated for the purposes of those legal matters and instead was generated in connection with the application for a U-Visa.  As such, the Court does not find it was created in anticipation of litigation.[2]   As Anderson and the ILCM have failed to set forth how Item 3 on the privilege log was generated in anticipation litigation, the work-product doctrine does not apply and they will be required to produce these documents to Gonzalez.

Items 4 and 5 are Anderson's notes regarding her communications with Zuniga and are therefore privileged.   Similarly, Item 6 on the privilege log is a letter from Anderson to Zuniga, notifying her of the status of her U-Visa application, Anderson's opinion, based on her experience, as to what will likely happen next, and advising Zuniga regarding her application.  Thus, the Court concludes that the letter is privileged and not subject to disclosure.

Items 7 through 10 are Anderson's case notes.   The log indicated that the redacted portion of Item 7 was a client communication and work product, while redacted portions of Items 8-10 only had a client communication designation.  As to the redacted portions of Item 7, the Court concludes that ILCM-00149 and ILCM-00150, through the

---

[2]     The Court notes that the memo contains a memorialization of communications with Zuniga, however, only the work-product doctrine was asserted as a basis for non-production.

first paragraph of the 4/1/2008 entry (ILCM-00150) are a memorialization of advisor and client communications and are therefore privileged. However, the remainder of the 4/1/2008 on ILCM-00150, deals with possible relief for Zuniga's husband and communications with other individuals regarding obtaining information in relation to Zuniga's application. They do not pertain to communications with Zuniga and are not privileged, and they were not generated in anticipation of litigation. Therefore, these sections of ILCM-150 must be produced to Gonzalez.

As to the redacted portions of Items 8 and 9 on the privilege log, the Court concludes that the first paragraph of the 7/14/2008 entry on ILCM-00151 starting with "[m]et with cl.," is privileged as a memorialization of a client communication.

The second 7/16/2008 entry starting on ILCM-00152 and ending on ILCM-000153 is a letter from Anderson to Zuniga, which is the same as Item 1, and therefore is privileged for the reasons stated above. Finally, the Court concludes that the second 10/07/2008 entry on ILCM-0154 is protected as a memorialization of a client-communication with Anderson.

### E. Waiver

Gonzalez argued that because the ILCM produced redacted notes from Anderson's file on Zuniga, any privilege has been waived as the result of this disclosure. In particular, Gonzalez cited to redacted ILCM-00149 through ILCM-00152 (Items 7-9), which contained notes from Anderson on April 29, 2008 on how she coordinated with an individual from CLUES regarding an investigation being conducted by a police investigator, and stated in her notes that she told the individual from CLUES to "call me upon completion so as not to have the appearance that the report is just for the U visa."

19

Defendant Marco Gonzalez's Reply to Immigration Law Center of Minnesota's Memorandum in Opposition to Motion to Compel, p. 2; Erickson Compel Decl., Ex. K. This Court notes that this argument is now moot to the extent that the ILCM is seeking to protect documents on the privilege log on the basis on the work product doctrine, as the Court has already concluded that the information designated as work product was not generated in anticipation of litigation.   As to client communications, "because the attorney client privilege and the work product doctrine have different standards of waiver, they must be considered separately, and the scope of the waiver of these protections may not be identical."   Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey, 210 F.R.D. 673, 675 (D. Minn. 2002) (marks and citation omitted); see also In re EchoStar Communications Corp., 448 F.3d 1294, 1300 (Fed. Cir. 2006) (citations omitted) ("The attorney-client privilege and the work-product doctrine, though related, are two distinct concepts and waiver of one does not necessarily waive the other.").

Under Rule 502 of the Federal Rules of Evidence:

> When the disclosure is made in a Federal proceeding . . . and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a Federal or State proceeding only if:
>
> (1)   the waiver is intentional;
>
> (2)   the disclosed and undisclosed communications or information concern the same subject matter; and
>
> (3)   they out in fairness to be considered together.

Fed. R. Evid. 502(a).

The Advisory Committee Note sets forth the narrow scope of this intentional waiver provision:

> [A] subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary ... [S]ubject matter waiver is limited to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner.

Rule 502 Advisory Committee Note (emphasis added).

As set forth under Rule 502(a) and its advisory comments, subject-matter waiver of the attorney-client privilege is only allowed where intentionally disclosed communications or information and undisclosed communications or information concerning the same subject matter should in fairness be considered together so as to "prevent a selective and misleading presentation of evidence. . . ."   Based on this standard, Anderson's notes regarding a communication with an individual from CLUES, in which Anderson provided that she asked "Mercedes" to tell her when the police report was complete so that it would not look like the report was made for the purposes of the U-Visa, does not mandate subject matter disclosure of all client communications.  The Court makes this finding because the disclosure was neither favorable to ILCM nor Zuniga.  In other words, this is not a situation where a privilege is being used as a shield and sword.  In any event, the Court has reviewed the client communications as part of its in camera inspection and has satisfied itself that the privileged communications do not involve the police investigation or its timing.  Therefore, even if the Court found that

subject matter waiver was appropriate, none of the communications dealing with Zuniga would have been waived.

Gonzalez also asserted that privileged communications should be produced because Zuniga's immigration status is at the center of this case and "in controversy."

The Eighth Circuit has found implied waiver of a privilege in situations where a plaintiff is asserting a physician-client privilege, yet at the same time was placing her medical condition in controversy as part of case, just as the "attorney-client privilege . . . can be waived when the client places the attorney's representation at issue." Schoffstall v. Henderson, 223 F.3d 818, 823 (8th Cir. 2000); see also Baker v. General Motors Corp., 209 F.3d 1051, 1055 (8th Cir. 2000) ("[A] waiver of the attorney-client privilege may be found where the client places the subject matter of the privileged communication at issue"). In Baker, the court described "two situations in which at-issue waiver is commonly found:

> The first is when proof of a party's legal contention implicates evidence encompassed in the contents of an attorney-client communication-for example, when a client uses reliance on legal advice as a defense or when a client brings a legal malpractice action. See State v. Campbell, 913 S.W.2d 832, 837 (Mo.Ct.App.1995); see also People v. Mitchell, 454 Mich. 145, 560 N.W.2d 600, 612 n. 27 (Mich.1997) (defendant who asserts ineffective assistance of counsel waives attorney-client privilege). The second is when a client's testimony refers to a specific privileged document. See, e.g., Charles Woods Television Corp. v. Capital Cities/ABC, Inc., 869 F.2d 1155, 1162 (8th Cir.1989) (applying Missouri law to find no at-issue waiver when witness testified generally about an issue and never mentioned any particular communication); McCarthy[v. Belcher], 340 N.W.2d at 850 (attorney-client privilege waived when client testifies on direct examination about a communication).

Id.

Even the nearly absolute immunity of attorney-opinion work product may be lost if a client places his attorney's opinions into direct issue.  See Minnesota Speciality Crops, Inc. v. Minnesota Wild Hockey Club, L.P., 210 F.R.D. 673, 677 (D. Minn. 2002) (citing Hager v. Bluefield Reg'l Med. Ctr., Inc., 170 F.R.D. 70, 78 (D.D.C. 1997)).

The rationale for the implied waiver doctrine is as follows:

> Implied waiver deals with an abuse of a privilege .... Where society has subordinated its interest in the search for truth in favor of allowing certain information to remain confidential, it need not allow that confidentiality to be used as a tool for manipulation of the truth-seeking process.... [A party asserting attorney-client privilege] cannot be allowed, after disclosing as much as he pleases, to withhold the remainder.

Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co., 129 F.3d 143, 151 (D.C. Cir. 1997) (quoting In re Sealed Case, 676 F.2d 793, 807 (D.C. Cir. 1982)).  This rationale especially has merit where a party partially discloses privileged material in support of its claim but then refuses to produce the remainder of the privileged information, which could be necessary to counter the claim.  Id.

Zuniga has not put her representation by Anderson as it relates to the U-Visa at issue in this case nor has she disclosed any privileged communications in support of her claim.  If anything, Gonzalez is the one who has placed Zuniga's immigration status at issue in this case.  While information regarding the reasons why Zuniga was seeking a U-Visa may be relevant to her claims of sexual harassment and assault, it does not place the representation by Anderson directly at issue in this case.  As such, this Court concludes that the implied waiver of privilege is not applicable to the present case.

23

F.    **Conclusion**

In summary, the ILCM and Anderson shall be required to produce to Gonzalez Items 2 and 3 listed on the privilege log; and the 4/1/2008 entry on ILCM-00150, not including the first paragraph, that is a part of Item 7 of the privilege log. The remainder of the Gonzalez motion as it relates to the ILCM and Anderson is denied.

## II.   PLAINTIFF'S MOTION TO COMPEL ELECTRONICALLY-STORED INFORMATION AND OTHER DISCOVERY [DOCKET NO. 211].

The only remaining issue as it relates to Plaintiff's Motion to Compel Electronically-Stored Information and Other Discovery [Docket No. 211] is the scope of the production of information and documents pertaining to complaints by employees of SMS regarding sexual harassment, sex discrimination and retaliation in response to Interrogatory Nos. 5-7, Document Request Nos. 10 and 12 (Set I), and Document Request (Set II) No. 5. See October 29, 2010 Order [Docket No. 271]. The discovery requests and SMS's responses at issue are as follows:

Interrogatories

> 5.    Identify each and every allegation or complaint, whether formal or informal, that you or any of your employees or agents have engaged in any unwelcome, inappropriate, or offensive sexual conduct and/or have harassed, discriminated against or retaliated against any female employee at any time in the last ten years. Your response should include any such allegations made in internal complaints, whether verbal or written; in a claim or charge brought before any governmental agency or private dispute resolution forum or service; any such allegations made pursuant to a collective bargaining agreement ("CBA"); and any lawsuits or litigation. For each such informal or formal allegation, complaint, claim, charge, agency or administrative proceeding, dispute resolution process, grievance and/or lawsuit identified:

24

a. Identify the complainant, the date of the complaint, and the complainant's relationship with Defendant Service Management Systems Inc.;

b. Describe the conduct alleged or complained of, including the time and place where the alleged conduct occurred, the identity of the persons alleged to have engaged in the conduct and each such person's relationship with Defendant Service Management Systems Inc., if any, at the time of the complaint and currently;

c. If an administrative or governmental agency proceeding occurred as a result of the allegation or complaint, identify the administrative office or agency involved and describe the proceeding in full. If the allegation or complaint was made in connection with or pursuant to a collective bargaining agreement, identity the CBA and describe the resolution process in full. If a private dispute resolution forum or service was involved, identity it and describe the manner in which the dispute was resolved. If the matter was litigated, provide the case name, file number, and jurisdiction; and

d. If not fully described in response to the previous sub-sections, please describe the manner in which the allegation or complaint was resolved, if any.

RESPONSE: Objection. This interrogatory is overly broad, vague, unduly burdensome, and not reasonably calculated to lead to the discovery' of admissible evidence. Defendant further objects to the extent the requested information is protected by the privacy rights of third parties not a party to this litigation. Without waiving said objections, Service Management will provide information regarding complaints at the Ridgedale Mall location involving allegations of sexual harassment by a female employee in the past five (5) years: There were not any complaints filed which fall into this category.

Service Management will also provide information regarding any lawsuits filed against it involving allegations of sexual harassment in the past five (5) years:

• Maria Ramirez v Service Management Systems, Inc., et al., Superior Court of Yentura County, California, Case No. CIY-232808;

• Ana Maria Mejia vs. Service Management Systems, Inc., Case No. CY-074973, Superior Court of the State of California for the County of Marin; and,

• Tanya Rodriguez vs. Service Management Systems, Inc., et al., Case No. BC374128, Superior Court of the State of California for the County of Los Angeles. Defendant is still searching for others and will supplement if necessary.

Supplemental Response: SMS fully incorporates herein its initial response and objections to this interrogatory. Subject to and without waiving the objections, SMS will supplement its response and provide information regarding complaints at the Ridgedale Mall location involving allegations of sexual harassment by a female employee since 2003, the beginning of Defendant Gonzalez's term of employment at that location. The below is the only such complaint from the Ridgedale location, aside from Plaintiff's allegation.

• Alideth Cuate Sanchez v. Raul Medina, Sandra Pradel, and Service Management Systems, Inc., Minnesota Department of Human Rights, Case No. 44404, filed August 16, 2004, dismissed November 19, 2004, pursuant to Minnesota Statutes § 363A.28.

6. For each and every allegation or complaint identified in your answer to Interrogatory No. 5, describe all actions you took in response to the allegation or complaint, including any investigation into the allegations or complaint, and identify each person involved in any way in responding to the allegation or complaint and describe each person's involvement.

RESPONSE: Objection. This interrogatory is overly broad (in time and scope), vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to the extent that the requested information is protected by the privacy rights of third parties not a party to this litigation. Additionally, this interrogatory seeks information protected by the attorney-client privilege and/or work product doctrine. Without waiving said objections, this information is not readily available as these files are closed and have been archived. To the extent possible, Defendant will supplement the information below. In general, however, once the company receives notice of a

claim, it is investigated and the necessary action is taken. Please see response to Interrogatory No.7.

<u>Supplemental Response</u>: SMS fully incorporates herein its initial response and objections to this interrogatory. Notwithstanding the objections, see documents bates-labeled SMS 0567-0608 regarding the actions SMS took in response to Ms. Alideth Cuate Sanchez's allegations of sexual harassment and retaliation. Marco Gonzalez and Carolyn Bowlds, of Corporate Human Resources, investigated and responded to the allegations.

7. From 2005 to the present, describe in detail the manner in which Defendant's employees were to bring to Defendant's attention any complaints of sexual harassment, discrimination, hostile work environment, or retaliation, including what constituted each, to whom it was to be reported and where that person was located, by whom it was to be investigated and the potential outcomes if such complaint was found to be true. Identify any document(s) in which this procedure was explained, and when and how each such procedure was implemented at Defendant's worksite at the Ridgedale Mall in Wayzata, Minnesota.

RESPONSE: Objection. This interrogatory is overly broad (in time and scope), vague, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving said objections, please see Service Management's Rule 26(a)(l) Disclosures and Supplemental Disclosures, Paragraph B. Plaintiff was made aware of and was provided a copy of the following: Service Management's policy prohibiting sexual harassment and other unlawful discrimination, etc., all of which were contained in Plaintiff's Personnel File and Employee Manual (see also Bates Doc. Nos. SMSOOOl-0181, SMS0204-0247), several posters were posted conspicuously at Plaintiffs workplace providing a toll free number to the Human Resources Helpline and also described what to do if any employee believed they were being subjected to unlawful harassment, discrimination, or other unlawful conduct. Plaintiff attended at least one work sponsored event further addressing these policies. Service Management's prohibition of unlawful discrimination and harassment in· the workplace provides avenues for aggrieved employees, including the Plaintiff, to register complaints which do not involve contacting the immediate

27

supervisor. All of this was explained in Plaintiff's Personnel
File and Employee Manual, along with a toll free number,
which was provided (see also, SMSOOOI-0005, SMS0017,
SMS0064). There is a vigorous policy against unlawful
discrimination and harassment of any kind.  Employees who
believe they have been harassed or discriminated against
are encouraged to immediately report such incidents to their
supervisor, anyone in management, or anyone in the Human
Resources Department so the report can be promptly and
thoroughly investigated, and, if warranted, appropriately
addressed. Employees making such reports are assured that
no action will be taken against them and that the
investigations are done confidentially. Service Management
is committed to a workplace free of unlawful discrimination
and harassment. These policies were made known to the
Plaintiff when she was hired and throughout her
employment. Further, Plaintiff acknowledged receipt of these
policies.

Document Requests

10. Any and all documents that concern or relate to any
informal or formal allegation, complaint, claim, charge,
agency or administrative proceeding, dispute resolution
process, grievance and/or lawsuit identified in your answer
to Plaintiffs Interrogatory No.5.

RESPONSE: Objection. This request is overly broad, vague,
unduly burdensome, and not reasonably calculated to lead
to the discovery of admissible evidence. Defendant further
objects to the extent the requested information is protected
by the privacy rights of third parties not a party to this
litigation. Without waiving said objections, Service
Management, in its response to plaintiff's interrogatories,
indicated that no similar complaints were found at the
Ridgedale Mall location involving allegations of sexual
harassment by a female employee in the past five (5) years.
Please see Defendant's response to Int. No. 5.  Plaintiff can
easily and readily obtain public information regarding the
referenced lawsuits.

Supplemental Response: SMS fully incorporates the
objections and response to this interrogatory as set forth in
its initial response to Plaintiff's First Requests for Production
of Documents. Subject to and without waiving the objections,

28

responsive documents are produced as documents bates-labeled SMS0567-0609.

12. Any and all documents that concern or relate to your responses to any allegations or complaints identified in your answer to Plaintiffs Interrogatory No. 5, as described in your answer to Plaintiff's Interrogatory No. 6, including, but not limited to, internal or external investigations and communications with, warnings or other remedial or disciplinary actions taken against any supervisor, manager, employee, or agent. If your answer states that any investigation was conducted, this document request is intended to cover not only any resulting report, but the notes made by the investigator, the correspondence to or from the investigator, and any documents the investigator reviewed.

RESPONSE: Objection. This request is overly broad, vague, unduly burdensome, duplicative, compounded, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to the extent the requested information is protected by the privacy rights of third parties not a party to this litigation. Without waiving said objections, Service Management, in its response to plaintiff's interrogatories, already provided information responsive to this request. Please see response to Int. Nos. 5 and 6.

<u>Supplemental Response</u>: SMS fully incorporates the objections and response to this interrogatory as set forth in its initial response to Plaintiff's First Requests for Production of Documents. Subject to and without waiving the objections, responsive documents are produced as SMS0567-0609.

<u>Document Request Set II</u>

DOCUMENT REQUEST NO.5:
Produce all documents reflecting or referring to any calls to Defendant's toll-free "Human Resources Helpline" from March 2001 to the present.

RESPONSE: Defendant objects to this request as overly broad and unduly burdensome. Defendant further objects to the extent the request seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence. Notwithstanding the objection, Defendant previously produced-as document bates-labeled SMS 0609-a log of all calls to SMS's Human Resources Department

regarding allegations of sexual harassment by an employee
from February 2004 to March 2005 and August 2005 through
May 2008, from SMS locations in the same corporate region
as the Ridgedale Mall. Call logs before February 2004 and
between March 2005 and August 2008 could not be located.
Defendant's call log does not differentiate between calls
routed to the Human Resources Department, calls placed
directly to an employee in the Department, and calls that are
received through the Human Resources Helpline.

See September 24, 2010 Declaration of Lisa C. Stratton in Support of Motion to Compel

Electronically-Stored Information and Other Discovery [Docket No. 214], Exs. 25, 26,

54, 56; Defendants SMS Holding Corporation and Service Management Systems, Inc.'s

Response to Plaintiff's Motion to Compel Electronically Stored Information and Other

Discovery ("Def.'s Mem.") [Docket No. 246], pp. 12-16.

Zuniga has asked that this Court order SMS to respond to Interrogatories Nos. 5

and 6 for the time-period of January 1, 2000 to the present, without geographical

limitations, concerning any "sex harassment" complaints brought against SMS.  See

Memorandum in Support of Motion to Compel Electronically-Stored Information and any

Other Discovery [Docket No. 213], p. 21.  The rationale for the 10-year period is that "it

roughly corresponded to Gonzalez's start of employment with SMS."  Id., p. 19.  Zuniga

also requested that SMS provide information regarding any retaliation claim that has

been asserted against it because she has alleged a retaliation claim against SMS.  Id.

Zuniga argued that because SMS has asserted an Ellerth/Faragher[3] defense to her

sexual harassment claims, based on her failure to use SMS's centralized company-wide

toll-free human resources helpline to report Gonzalez's conduct to SMS, there is no

---

[3]      "Ellerth/Faragher" refers to the decisions by the United States Supreme Court,
Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca
Raton, 524 U.S. 775 (1998).

basis for SMS's refusal to produce reports of sexual harassment, sex discrimination and retaliation complaints.  Id.  Zuniga conceded that SMS produced a supplemental response to Interrogatory No. 5, which included call logs; however, she maintained that the call logs only contained cryptic data regarding calls made to SMS's hotline pertaining to sexual harassment complaints.  Id., pp. 21-22.  Zuniga complained that the logs were an inadequate substitute for narrative responses to Interrogatories Nos. 5-7, and that no other documents regarding these complaints have been produced.  Id., p. 22.  In light of SMS's reliance on the Ellerth/Faragher defense, Zuniga maintained that she was entitled to any documentation bearing on complaints regarding sexual harassment and retaliation reported via the call line, and SMS's response and investigation into the reported complaints.  Id.

SMS countered that it would be unduly burdensome for it to have to search the files of its 22,000 employees nationwide for complaints of harassment over a ten-year period, particularly where Zuniga only experienced a hostile work environment from March through October 2007.  See Defendants SMS Holding Corporation and Service Management Systems, Inc.'s Response to Plaintiff's Motion to Compel Electronically Stored Information and Other Discovery [Docket No. 246], pp. 17-18.  In addition, SMS argued that Zuniga is only entitled to relevant discovery in the form of sexual harassment claims at the job location where she was employed.  Id., p. 20.  SMS also asserted that the discovery sought is not relevant to its Ellerth/Faragher defense, as this defense only goes to the policies and procedures available to Zuniga to make a complaint about Gonzalez's alleged conduct and her failure to take advantage of those procedures.  Id., p. 22.  According to SMS, the Ellerth/Faragher defense does not

31

provide Zuniga with an avenue to obtain discovery on all complaints made to SMS via the hotline, especially from employees located in other states.  Id., pp. 22-23.

In reply, Zuniga submitted that SMS had not put forth any evidence of the burden to produce the requested discovery regarding complaints.  See Reply Memorandum in Support of Motion to Compel Electronically-Stored Information and any Other Discovery [Docket No. 254], pp. 1-2.  Further, Zuniga argued that SMS had broadened the scope of discovery by asserting the Ellerth/Faragher defense and by choosing to handle all discrimination claims nationwide at its national Human Resources Department in Nashville, Tennessee.  Id., pp. 3-4.  Specifically, Zuniga asserted that because SMS argued that it had exercised reasonable care to prevent and promptly correct any sexually harassing behavior by offering this hotline and because she had failed to use the hotline, she was entitled to evidence showing how other employees understood the hotline and used the hotline, and how SMS responded to complaints made via the hotline or directly to its Human Resources Department.  Id., p. 4.

At the hearing, counsel for SMS proposed as a compromise production of all complaints, resulting in investigations and responses by SMS dealing with sexual harassment and retaliation from January 1, 2003 through April 20, 2008. for all the locations within the geographical region (Region 914) where Ridgedale was located, which included: Valley View Mall in Wisconsin; Rushmore Mall in South Dakota; Rim Rock Mall in Montana; Lyndale Mall in Iowa; Mesa Mall in Colorado; Southern Hills Mall in Iowa; Southridge Mall in Wisconsin; and Empire Mall in South Dakota.

In both Ellerth and Faragher, the United States Supreme Court held that an employer may be held vicariously liable for the creation of a hostile work environment by

32

a supervisor although the employee suffered no adverse employment action.  See Faragher, 524 U.S. at 802; Ellerth, 524 U.S. at 764-65.  The Ellerth/Faragher affirmative defense has two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765; see also Weger v. City of Ladue, 500 F.3d 710, 718 (8th Cir. 2007) (same).  As to the first part of the Ellerth/Faragher affirmative defense, if a promulgated policy dealing with sexual harassment "is unreasonable or unenforced then it cannot be used to demonstrate that [a defendant] exercised reasonable care in preventing and correcting sexual harassment."   Adams v. O'Reilly Automotive, Inc., 538 F.3d 926, 929 (8th Cir. 2008).  Accordingly, if SMS "routinely ignored its stated anti-harassment policy, then no matter how good the policy is in theory, [it] cannot establish the first part of the Ellerth-Faragher defense.  Id. at 930.

In its Answer, SMS asserted as an affirmative defense that it "has policies and procedures in place reasonably promulgated to prevent and correct harassment and other unwelcome conduct in the workplace.   Plaintiff unreasonably failed to take advantage of those policies and procedures."   Answer, Affirmative Defenses, ¶ 4 [Docket Nos. 4, 5].  At the hearing, counsel for SMS confirmed that his client will be asserting the Ellerth/Faragher affirmative defense in the case.  As such, Zuniga is entitled to discovery on the effectiveness and the enforceability of the procedures put in place to allow employees to report sexual harassment, including information on how SMS handled complaints.

33

The issue then becomes the breadth of the discovery Zuniga should receive. SMS asserts that it should be no more than the complaints and investigations from the region in which Ridgedale is located, while Zuniga argued that she is entitled to nationwide discovery. Generally, nationwide discovery of a corporation's records is not allowed in employment cases "absent a showing of a particular need for the requested information." Semple v. Federal Exp. Corp., 566 F.3d 788, 794 (8th Cir. 2009);[4] see also Sallis v. University of Minn., 408 F.3d 470, 478 (8th Cir. 2005) ("Courts have also

---

[4]    In Semple, the Eighth Circuit cited to Finch v. Hercules Incorporated, 149 F.R.D. 60, 62 (D. Del. 1993). See Semple, 566 F.3d at 794. In Finch, the plaintiff had been terminated as part of reduction in the workforce. As part of discovery, plaintiff sought any adverse age discrimination rulings from either federal or state agencies against the defendant from 1985 onward; statistical information on terminations, lay-offs and retirees; and documentation of early retirement plans offered to defendant's employees from 1985 onward. 149 F.R.D. at 61. While the initial decision to terminate the plaintiff was made by the local unit, the corporate Policy Compliance Committee was involved in the decision. Id., at 64. The guidelines which governed this Committee's actions indicated that the Committee did not make the initial decision to terminate. Id. The Committee did, however, possess a power of approval over the choices referred to it by each individual work unit. Id. The district court determined that:

> Because the plaintiff's termination occurred by decisions made by both his individual work unit and the Committee, the Court finds that information which will reflect on the decision making of either of these bodies is relevant. The existence of a body outside the plaintiff's work unit which had approval power over his termination precludes a limitation of discovery to the individual work unit. However, this conclusion does not justify extending discovery beyond information which pertains to the Committee or the local work unit. The only discovery outside the local work unit which is relevant to plaintiff's claim is the discovery pertaining directly to the activities of the Committee which performed its function nationwide. For this reason, plaintiff's motion to compel with respect to interrogatories 13, 14, 18, 19 and 20 and document request number 15 will be granted within the local work unit and outside the unit only as to the activities of the Committee.

Id.

34

limited the discovery of company records to the local facility where plaintiff was employed, where there is no showing of the need for regional or nationwide discovery.") (citation omitted).  In cases that have rejected nationwide or companywide discovery, courts have emphasized that the employment decision at issue was made locally.  See, e.g., Semple, 566 F.3d at 794 ("There are no facts in the current case indicating that Federal Express's management beyond the Northland District was involved in Semple's termination beyond review through the company's internal appeals process. The fact that this policy applied nationally has little bearing on its application by local management within the Northland District, and as a result, Semple is unable to establish a particular need for his broad discovery request."); Sallis, 408 F.3d at 478 (finding that the plaintiff was only entitled discovery from his department as opposed to discovery from all departments at the university); Carroll v. United Parcel Service, Inc., 71 Fed. Appx. 949, 951 (3rd Cir. 2003) (Upholding limiting discovery to the district in which the employee was employed "since the employment decision that [plaintiff] alleged was discriminatory (her termination) was made locally."); Earley v. Champion Int'l, Corp., 907 F.2d 1077, 1084 (11th Cir. 1990) ("Where, as here, the employment decisions were made locally, discovery on intent may be limited to the employing unit.") (citation omitted); Onwuka v. Federal Express Corp., 178 F.R.D. 508, 518 (D. Minn. 1997) (finding that where the crux of plaintiff's claim was that he was being treated differently than other workers in the same local, the plaintiff was not entitled to discovery outside of his specific workplace).

In this case, the Court finds that nationwide discovery is necessary and appropriate with respect to complaints of sexual harassment, so as to allow Zuniga to

investigate and respond to SMS's reliance on the Ellerth/Faragher affirmative defense. Zuniga has presented evidence, which SMS has not contested, that SMS's Human Resources Department in Nashville, Tennessee handles all calls into the employee hotline regarding reports of harassment and conducts the investigations of these complaints.  In addition, SMS represented at the hearing that if a supervisor receives a complaint, that complaint is routed to the Human Resources Department in Nashville for investigation and handling.  Even assuming that the final decision regarding whether to discipline an employee based on a complaint may fall on an employee's local supervisor or manager, the fact that the intake and investigation of complaints are handled by SMS nationally dictates that SMS cannot limit its response only to the Ridgedale Mall or the region in which the Ridgedale Mall is located.  To do so would deprive Zuniga of potentially relevant information as to whether SMS's intake, investigation and handling of the complaints was sufficient to find that its policies were reasonable and enforced, and by extension, whether SMS's reliance on the Ellerth/Faragher defense is appropriate.  In short, SMS cannot on the one hand tout that it takes reasonable steps to prevent and correct promptly any sexually harassing behavior – a process in which in large part occurs at the national level of SMS – and at the same time, deprive Zuniga of the right to conduct her own investigation of the veracity of this claim.

As for SMS's complaints of burden, they are rejected.  First, as Zuniga pointed out, SMS provided no support for its claim.  Broad allegations of burdensomeness, without more, will not suffice.  See Wagner v. Dryvit Sys. Inc., 208 F.R.D. 606, 610 (D. Neb. 2001) (holding that "an objection that discovery is overly broad and unduly burdensome must be supported by affidavits or offering evidence revealing the nature of

the burden and why the discovery is objectionable.  It is not sufficient to simply state that the discovery is overly broad and burdensome…."); see also Sinco, Inc. v. B & O Mfg., Inc., No. 03-5277(JRT/FLN), 2005 WL 1432202 at *2 (D. Minn. May 23, 2005) (citing Mead Corp. v. Riverwood Natural Res. Corp., 145 F.R.D. 512, 515-16 (D. Minn. 1992)) ("The party opposing discovery bears the burden of showing that the discovery request is overly broad and burdensome by alleging facts demonstrating the extent and nature of the burden imposed by preparation of a proper response.").  Lacking support for a claim of burdensomeness, this Court has no basis for relieving SMS from its duty to search for documents responsive to Zuniga's requests.

Moreover, SMS's burden argument focused on its belief that it would have to search nationwide through the personal files of thousands of employees to respond to Zuniga's discovery.  However, the representations before this Court are that the Human Resources Department in Nashville serves as the clearinghouse for all complaints and investigations.  Thus, as a preliminary matter, the Court will not require SMS to search the files of employees across the country to look for and identify complaints of sexual harassment.  Instead, SMS will only be required search its Helpline records and the records at the Human Resources Department in Nashville to identify complaints[5] of sexual harassment from employees of SMS to develop its responses to Interrogatory No. 5 (identification of complaints of sexual harassment).  Then once the complaints are identified, SMS can search the appropriate sources (e.g., an employee's personnel file, supervisor or manager files, the Human Resources Department) for information and

---

[5]     This Court uses the term "complaints" to reference internal complaints, whether verbal or written; a claim or charge brought before any governmental agency or private dispute resolution forum or service; any such allegations made pursuant to a collective bargaining agreement ("CBA"); and any lawsuits or litigation.

documents responsive to Interrogatory No. 6 (Set I) (relating to responses to complaints), Document Request No. 10 (Set I) (documents relating to complaints of sexual harassment), Document Request No. 12 (documents relating to responses to complaints), and Document Request No. 5 (Set II) (documents reflecting calls to the Helpline regarding complaints of sexual harassment).

Additionally, the Court will limit SMS's search for responsive information and documents for complaints of sexual harassment as requested by Interrogatory Nos. 5 and 6, Document Request Nos. 10 and 12 (Set I), Document Request No. 5 (Set II), to the time period of January 1, 2005 through December 31, 2007. Discovery in Title VII cases is generally limited to "a reasonable time period" before and after the alleged discriminatory acts. Sallis, 408 F.3d at 478. In this case, Zuniga was an employee of SMS from June 2005 to November 2006, and again from February 2007 to October 2007. Amended Complaint, ¶ 18 [Docket No. 149]. She was hired by and worked for Gonzalez on both occasions. Id., ¶¶ 22, 25, 26. The alleged harassment by Gonzalez took place from March through her date of termination on October 18, 2007. Id., ¶¶ 27-34. To the extent that SMS is relying on its handling of complaints of sexual harassment to make out the first prong of the Ellerth/Faragher defense, the period of time shortly before Zuniga began work for SMS and shortly after she left the company is the relevant period of time for SMS's response to this discovery. After all, if it is Zuniga's claim, as argued by her attorney at the hearing, that she did not report Gonzalez's harassment because she was afraid for her employment and immigration status, then it is reasonable to assume that what she was hearing had to do with its handling of complaints surrounding the time period she worked for the company.

38

As for discovery into complaints of retaliation, because Zuniga's alleged fear of retaliation resulted from actions occurring at Zuniga's workplace, this Court finds that nationwide discovery is not relevant to Zuniga's claims.  In addition, the case law does not extend the Ellerth/Faragher defense to retaliation claims.  See, e.g., Braswell v. Allen, 586 F.Supp.2d 1297, 1308 (M.D. Ala. 2008) ("Defendants argue that they may assert a Faragher defense to Plaintiffs' discrimination and retaliation claims. Defendants fail to cite any authority that extends Faragher outside the harassment context, nor has the Court been able to find such authority."); Broussard v. Wells Bloomfield, No. 3:05-CV-0532-RAM, 2007 WL 1726571 at *7 (D. Nev. June 13, 2007) ("Ellerth only applies to situations where the plaintiff alleges that he or she was harassed by a supervisor with immediate, or successively higher, authority over the employee.  See Ellerth, 524 U.S. at 765. No case has been brought to the court's attention indicating that Ellerth would apply to the retaliatory, as distinguished from the sexually harassing, actions of supervisors. In fact, in Burlington Northern the Supreme Court recently pointed out that Ellerth does not even mention Title VII's anti-retaliation provision at all. Burlington Northern[ & Santa Fe Ry. Co. V. White, --- U.S. ----, ----, 126 S.Ct. 2405, 2414 (2006)]. Ellerth explicitly contemplates sexual harassment claims, not retaliation claims.").

Whereas how SMS's national Human Resources Department responded to complaints of sexual harassment is relevant to Ellerth/Faragher defense, Zuniga has not articulated how the overall national response to claims of retaliation would assist her retaliation claim.  As such, this Court finds that SMS's offer to produce information in its possession or control, regarding complaints made by employees of retaliation with respect to sexual harassment, for locations contains in Region 914 to be reasonable.

Therefore, SMS shall answer Interrogatory Nos. 5 and 6, Document Request Nos. 10 and 12 (Set I) and Document Request No. 5 (Set II) regarding complaints of retaliation for making claims of sexual harassment, regardless of the location of the information and documents bearing on these complaints. The response shall be limited to complaints received for the period January 1, 2005 through December 31, 2007. SMS will not be required to produce information and documents regarding retaliation outside of the scope of sexual harassment, as the handling of those claims has no bearing on the claims or defenses by the parties in this suit. Likewise, although Zuniga requested discovery concerning complaints of sex discrimination or retaliation for making claims of sex discrimination, she has acknowledged that she is not asserting a disparate treatment claim and therefore, the Court will not require SMS to produce information regarding complaints of sex discrimination or retaliation complaints related to sex discrimination.

As to Interrogatory No. 7, Zuniga's counsel conceded at the hearing that Zuniga was not seeking a new answer to this interrogatory. In any event, this Court finds that the answer provided is responsive. As such, Zuniga's motion to compel as it relate to Interrogatory No. 7 is denied.

In summary, SMS is ordered to amend and supplement its responses to Interrogatory Nos. 5 and 6 (Set I), Document Request Nos. 10 and 12 (Set I), and Document Request (Set II) No. 5 as follows:

- SMS shall search its Helpline records and the records maintained at the Human Resources Department in Nashville to identify complaints of sexual

harassment received during the time period of January 1, 2005 through December 31, 2007 to develop its responses to Interrogatory No. 5 (Set I).

- As for Interrogatory No. 6 (Set I), Document Request Nos. 10 and 12 (Set I), and Document Request No. 5 (Set II), SMS shall respond to this discovery for those complaints identified by Interrogatory No. 5, regardless of where the information and documents are located.

- SMS shall answer Interrogatory Nos. 5 and 6 (Set I), Document Request Nos. 10 and 12 (Set I) and Document Request No. 5 (Set II) regarding complaints of retaliation for making claims of sexual harassment received during the period January 1, 2005 through December 31, 2007, for Region 914, regardless of where the information and documents are located.

## III. PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS LISTED ON THE PRIVILEGE LOG OF DEFENDANTS SERVICE MANAGEMENT SYSTEMS, INC. AND SMS HOLDINGS CORPORATION [DOCKET NO. 276]

Zuniga has brought the present motion seeking the production of documents that SMS has listed on its privilege log.  Zuniga has set forth a number grounds for the production of relevant documents that SMS has withheld on the basis of the attorney-client privilege, the work product doctrine or relevancy including: SMS's untimely production of a privilege log; subject matter waiver based on SMS's reliance on the Ellerth/Faragher defense; subject matter waiver dealing with the corrective measures taken by SMS, as evidenced by SMS's simultaneous production and withholding of factually indistinguishable documents; and her substantial need for the documents .

In opposition, SMS asserted that the documents it withheld – specifically those in response to Zuniga's EEOC Charge of discrimination – are covered by the work product

doctrine because they had been generated in anticipation of litigation. SMS also contended that it did not waive the attorney-client privilege or the work product doctrine by relying on the Ellerth/Faragher defense, especially where it has provided a number of documents demonstrating that it had in place an anti-harassment policy that was properly enforced and Zuniga failed to complain until after her employment with SMS ended. Further, SMS submitted that any need by Zuniga for these documents, particularly in conjunction with her claim for punitive damages, was premature. Finally, SMS argued that any inadvertent disclosures on its part were due to the expansive nature of electronic discovery in the case, and that any subject matter waiver should be limited to communications between Tannock and Gonzalez. [6]

### A.    Untimely Privilege Logs

Zuniga complained that SMS did not produce a privilege log until September 20, 2010, almost two months after the close of discovery, and therefore she was unable to challenge its privilege claims during the discovery period. See Plaintiff's Memorandum of Law in Support of Motion to Compel Documents Listed on the Privilege Log of Defendants Service Management's Systems, Inc. and SMS Holdings ("Pl.'s Priv. Mem."), pp. 3, 28. This Court concludes that based on the five privilege logs provided to Zuniga prior to filing the present motion to compel and the December 21, 2010 privilege log ordered by the Court, Zuniga had an adequate opportunity to challenge any privilege asserted by SMS. As such, the Court finds there is no waiver of any assertion of privilege on the part of SMS on this basis.

---

[6]    SMS also has asserted that Zuniga did not engage in an adequate meet and confer for the purposes of Local Rule 37.1. This Court finds otherwise, based on its review of the record.

**B.**    **Subject Matter Waiver Based on SMS's Reliance on the Ellerth/Faragher Defense**

Zuniga argued that because SMS has placed its corrective measures at issue by relying on the Ellerth/Faragher defense, it has waived the attorney-client and work product privileges for documents concerning corrective measures, including documents regarding the investigation of her complaint of sexual harassment.    See Pl.'s Priv. Mem., pp. 19-22.  In response, SMS asserted that it has offered to produce all factual information obtained from its internal investigation of Zuniga's complaint.    See Defendants SMS Holdings Corporation and Service Management System, Inc.'s Response in Opposition to Plaintiff's Motion to Compel Documents Listed in SMS' Privilege Log (SMS Priv. Mem.") [Docket No. 294], p. 9.  However, SMS maintained that it was entitled to raise the Ellerth/Faragher defense without waiver of any privileges associated with its efforts to defend itself in the administrative or civil process.  Id., pp. 8-9.

Under federal common law,[7] the attorney-client privilege is a "long established rule that confidential communications between an attorney and his client are absolutely

---

[7]    State law applies to the issue of the attorney-client privilege when the subject matter jurisdiction is based on diversity, whereas the federal common law applies where subject matter jurisdiction is premised on a federal question.  See Fed. R. Evid. 501; Simon, 816 F.2d at 402.  In cases where there are both state and federal claims, if the evidence sought is only relevant to the state claims, then state law applies; however, if the evidence sought is relevant to both the state and federal claims, then federal common law applies.  See Lykken v. Brady, No. CIV. 07-4020-KES, 2008 WL 2077937 at *4 (D.S.D. May 14, 2008) (citing Hansen v. Allen Memorial Hosp., 141 F.R.D. 115, 121 (S.D. Iowa 1992) (collecting cases)) ("The court then examined decisions from other courts and concluded that, where the issue is the discoverability of evidence that is relevant to both the federal and the state claims, courts have consistently held that federal law determines the existence and scope of any asserted privilege.").  Here, the evidence sought is pertinent to both the MHRA and Title VII claims by Zuniga against defendants.  As such, federal common law applies.

43

privileged from disclosure against the will of the client." Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 601 (8th Cir. 1977). "Communications made by and to in-house lawyers in connection with representatives of the corporation seeking and obtaining legal advice may be protected by the attorney-client privilege just as much as communications with outside counsel." Boca Investerings Partnership v. United States, 31 F. Supp.2d 9, 11 (D.D.C. 1998) (citing Upjohn Co. v. United States, 449 U.S. 383, 389-97 (1981)) (citations omitted). However, the attorney-client privilege applies only to confidential communications made to facilitate legal services, and does not apply where a lawyer acts as a scrivener or business advisor. See United States v. Horvath, 731 F.2d 557, 561 (8th Cir. 1984) (citations omitted); see also Simon, 816 F.2d at 403 (finding that the attorney-client privilege does not protect client communications that relate only to business information); Boca Investerings Partnership, 31 F. Supp.2d at 11 ("By contrast, communications made by and to the same in-house lawyer with respect to business matters, management decisions or business advice are not protected by the privilege.") (citation omitted). Further, a "communication is not privileged simply because it is made by or to a person who happens to be a lawyer." See Diversified Indus., Inc., 572 F.2d at 602 ("A communication is not privileged simply because it is made by or to a person who happens to be a lawyer.") (citations omitted). In addition, the attorney-client privilege "'only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.'" PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership, 187 F.3d 988, 994 (8th Cir. 1999) (quoting Upjohn Co., 449 U.S. at 395).

The attorney work product doctrine was first articulated in <u>Hickman v. Taylor</u>, 329 U.S. 495, (1947), and is now expressed in Fed. Rule Civ. P. 26(b)(3)(A) and (B), which provides:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered … if … the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> * * *
>
> If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Thus, the work-product doctrine protects materials that are: 1) documents and tangible things; 2) prepared in anticipation of litigation or for trial; and 3) by or for another party or by or for that other party's representative. <u>Onwuka</u>, 178 F.R.D. at 512 (citing Fed. R. Civ. P. 26(b)(3)) (citations omitted).

There are two kinds of work product-ordinary work product and opinion work product. .

> Ordinary work product includes raw factual information. <u>See</u> <u>Gundacker v. Unisys Corp</u>., 151 F.3d 842, 848 n. 4 (8th Cir.1998). Opinion work product includes counsel's mental impressions, conclusions, opinions or legal theories. <u>See</u> <u>id.</u> at n. 5. Ordinary work product is not discoverable unless the party seeking discovery has a substantial need for the materials and the party cannot obtain the substantial equivalent of the materials by other means. <u>See</u> Fed.R.Civ.P. 26(b)(3). In contrast, opinion work product enjoys almost absolute immunity and can be discovered only in very rare and extraordinary circumstances, such as when

45

> the material demonstrates that an attorney engaged in illegal
> conduct or fraud.

Baker, 209 F.3d at 1054.

The "scope of the work-product protection is broader than that of the attorney-client privilege since items protected by the work-product doctrine are not confined to confidential communications between an attorney and a client, but extends protection to all 'documents and tangible things' that have been prepared in anticipation of litigation, or for trial." Onwuka, 178 F.R.D. at 512 (citation omitted). However, a party may not use the work-product doctrine to shield, from legitimate discovery, the information that underlies the allegations and claims at issue in a case. See In re Grand Casinos, Inc., 181 F.R.D. 615, 622 (D. Minn. 1998). Likewise, there is no work-product protection for documents prepared in the regular course of business even where litigation is anticipated. See Highland Tank & Mfg. Co. v. PS Intern., Inc., 246 F.R.D. 239, 246 (W.D. Pa. 2007) (quoting Leach v. Quality Health Servs., 162 F.R.D. 499, 502 (E.D. Pa. 1995), citing Raso v. CMC Equip. Rental, 154 F.R.D. 126, 128 (E.D. Pa. 1994)) ("[T]that the author of a document actually anticipated litigation is not enough to trigger the protection; the work-product doctrine 'only protects documents prepared in anticipation of litigation, not in the regular course of business.'"); see also In re Om Sec. Litig., 226 F.R.D. 579, 585 (N.D. Ohio 2005) (quoting 8 Wright, Miller, & Marcus, Federal Practice and Procedure, § 2024 (2d ed. 1994) ("'[E]ven though litigation is already in prospect [sic], there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.'").

As for internal investigations conducted by or at the direction of counsel in direct response to an EEOC charge, courts generally have held that they are work product because they are in anticipation of litigation.  See Malin v. Hospira, Inc., NO. 08C4393, 2010 WL 3781284 at *1 (N.D. Ill. Sept. 21, 2010) ("In other words, documents are protected when it is fair to say that they were prepared because of impending litigation. We find this principle applies here: Ms. Roche's interview notes were a response to plaintiff's EEOC charge. Plaintiff argues that because the notes were made in conjunction with what plaintiff calls a 'routine investigation' then they do not fall under the work product privilege.  But, again, we must consider the entirety of the events. Plaintiff had already filed her charge of discrimination. The notes were, therefore, prepared with "an eye toward litigation" and fall within work product protection."); Treat v. Tom Kelley Buick Pontiac GMC, Inc., Cause No. 1:08-CV-173, 2009 WL 1543651 at *7 (N.D. Ind. June 02, 2009) ("In this instance, outside counsel's investigation was clearly in anticipation of litigation, as its purpose was to prepare Kelley's response to the EEOC charges.") (string citation omitted); Willingham v. Ashcroft, 228 F.R.D. 1, 5 (D.D.C. 2005) ("As I have previously indicated, reasonable lawyers know that, if the EEO process results in a determination favorable to the [defendant], plaintiff will likely bring litigation in the District Court."); McPeek v. Ashcroft, 202 F.R.D. 332, 339 (D.D.C. 2001) ("the moment the employee filed a charge with the EEOC, the work done thereafter was done in anticipation of litigation.").

Neither the attorney-client privilege nor the work product protection are absolute, and both may be waived.  See United States v. Nobles, 422 U.S. 225, 239 (1975).  "A waiver of the attorney-client privilege may be found where the client places the subject

matter of the privileged communication at issue." Baker, 209 F.3d at 1055; see discussion at Section I.E, supra, regarding "at-issue" waiver. Similarly, disclosure to an adversary can waive the work product protection as to items actually disclosed. See In re Chrysler Motors Corp., 860 F.2d 983, 988 (8th Cir. 1997). And again, as previously noted, even the nearly absolute immunity of attorney-opinion work product may be lost if a client places his attorney's opinions into direct issue. See Minnesota Speciality Crops, Inc., 210 F.R.D. at 677 (citation omitted).

The party asserting the attorney-client privilege or the work product doctrine bears the burden to provide a factual basis for its assertions. Triple Five of Minnesota, Inc. v. Simon, 212 F.R.D. 523, 528 (D. Minn. 2002) (citing Hollins v. Powell, 773 F.2d 191, 196 (8th Cir. 1985)). "This burden is met when the party produces 'a detailed privilege log stating the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit' from counsel." Triple Five of Minnesota, 212 F.R.D. at 528 (quoting Rabushka ex rel. United States v. Crane Co., 122 F.3d 559, 565 (8th Cir.1997) (applying the test to both attorney-client privilege and the work product doctrine)).

As stated previously, the first element of the Ellerth/Faragher affirmative defense requires an employer to demonstrate that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior. See Weger, 500 F.3d at 718. SMS acknowledged at the hearing that to the extent that it is relying on the Ellerth/Faragher defense, it will have to show what it did to investigate Zuniga's complaint and what remedial actions it took in order to satisfy the first element of the defense. While the Eighth Circuit has not yet spoken on this issue, many courts have concluded that

asserting the Ellerth/Faragher defense waives any attorney-client or work product privilege that might apply to documents or communications concerning an employer's investigation and remedial efforts.   See, e.g., Musa-Muaremi v. Florists' Transworld Delivery, Inc., 270 F.R.D. 312, 319 (N.D. Ill. 2010) (finding that asserting the Faragher/Ellerth defenses waives any attorney-client privilege that might apply to a defendant's investigation documents or communications, as the "only way that the plaintiff, or the finder of fact, can determine the reasonableness of Defendant's investigation is through full disclosure of the contents thereof. It would be unfair to allow an employer to hide its investigations and remedial efforts in the case up to the point of trial when it intends to use related evidence of its remedial efforts to evade liability.") (marks and citations omitted); Reitz v. City of Mt. Juliet, 680 F. Supp.2d 888, 893 (M.D. Tenn. 2010) ("[W]hen a Title VII defendant raises a Faragher-Ellerth defense premised on an internal investigation, the defendant waives the attorney-client privilege and work-product protection for documents underlying the final investigative report-including interview memoranda authored by the investigator."); E.E.O.C. v. Outback Steakhouse of FL, Inc., 251 F.R.D. 603, 612 (D. Colo. 2008) ("to the extent that Defendants have asserted the Faragher/Ellerth affirmative defense, they have waived the protections of the attorney-client privilege and work product doctrine regarding investigations into complaints made by female employees."); Desmare v. New Mexico, NO. CIV 07-199 (JB/RHS), 2007 WL 5231689 at *4, 9 (D.N.M. Aug. 10, 2007) ("It is enough to say that the State has acknowledged that it will raise the Faragher/Ellerth defense and therefore it has waived any privileges it may have asserted with respect to its investigatory materials.") (citations omitted); Jones v. Rabanco, Ltd., (NO. C03-3195P), 2006 WL

2401270 at *4 (W.D. Wash. Aug. 18, 2006) ("This Court has held that the <u>Faragher-Ellerth</u> defense raised by Defendants early in this matter will cause any investigation and remedial efforts into the discrimination alleged in this case, in which Defendants engaged and in which their attorneys were involved, to become discoverable, despite any attorney-client privilege that may have normally attached to such communications. The Court has made this ruling based on the principle that it is unfair for the Defense to hide its investigations and remedial efforts in this matter behind the veil of privilege up until the point of trial, where it plans to use evidence of its remedial efforts to evade liability.") (citation omitted); <u>Austin v. City & County of Denver ex rel. Bd. of Water Com'rs</u>, No. 05-CV-01313, 2006 WL 1409543 at *7 (D. Colo. May 19, 2006) ("Where a party puts the adequacy of its pre-litigation investigation into issue by asserting the investigation as a defense, the party must turn over documents related to that investigation, even if they would ordinarily be privilege[d]."); <u>Walker v. County of Contra Costa</u>, 227 F.R.D. 529, 535 (N.D. Cal. 2005) ("If Defendants assert as an affirmative defense the adequacy of their pre-litigation investigation into [the plaintiff's] claims of discrimination, then they waive the attorney-client privilege and the work-product doctrine with respect to documents reflecting that investigation."); <u>McGrath v. Nassau County Health Care Corp.</u>, 204 F.R.D. 240, 246 (E.D.N.Y. 2001) ("while the Court finds the waiver of some core work product difficult to sustain, it agrees that NHCC's invocation of the <u>Faragher-Ellerth</u> defense has waived the work product privilege under the facts of this case. By weighing fairness concerns against the purpose of the work product privilege, the Court finds that it would be unjust to allow NHCC to invoke the

Faragher-Ellerth defense under these facts while allowing it to protect the very documents it relies on to assert that defense.").

Each of these cases stand for the proposition that an employer cannot use the attorney-client privilege or the work product doctrine to conceal its investigations and remedial efforts, while at the same time relying on these investigations to support its invocation of the Ellerth/Faragher affirmative defense to avoid liability on an employee's claims of sexual harassment.  Consequently, to allow SMS to withhold its investigation from Zuniga would be unjust, as the only way that she or the finder of fact, can discern the reasonableness of SMS's investigation and corrective action is through the full disclosure of the contents the investigation and any subsequent remedial actions it took as a result of that investigation.

That said, the Court must still determine whether all documents generated and communications made concerning SMS's investigation of Zuniga's complaint lose protection from discovery pursuant to the attorney-client privilege and the work product doctrine, where the investigation by SMS took place both before and after Zuniga's charge of discrimination filed with the EEOC.  Thus, the question is whether the investigation performed by SMS before and after Zuniga filed her EEOC charge on March 11, 2008, is fair game for discovery by Zuniga.  The facts that bear on this inquiry are as follows:

On October 18, 2007, SMS terminated Zuniga for job abandonment.  It was not until January 17, 2008, that Veronica Mendez from the Worker's Interfaith Network contacted Jane Suko of SMS at the Ridgedale Mall to advise her that a former SMS employee was alleging sexual harassment.  See Declaration of Sarah C. Maxwell in

Support of Defendants SMS Holdings Corporation and Service Management System, Inc.'s Response in Opposition to Plaintiff's Motion to Compel Documents Listed in SMS' Privilege Log ("Maxwell Privilege Decl.") [Docket No. 295], Ex. B (Feb. 21, 2008 Letter from University of Minnesota Law Clinic to SMS Manager).  On January 22, 2008, SMS learned that Zuniga was the former worker complaining of harassment and that defendant Gonzales was the alleged harasser.  Id.  On January 23, 2008, Debbi Tannock ("Tannock"), SMS Employee Relations Specialist, sent Zuniga's counsel a letter asking that Zuniga provide SMS with a statement regarding her allegations.  Id., Ex. C.  On February 29, 2008, Scott Mayer, also a SMS employee relations specialist, sent a letter to Zuniga's counsel, stating, "SMS has looked into Ms. Zuniga's allegations and continues to search for facts in this matter."  Id., Ex. D.  Mayer reiterated SMS's request for a statement from Zuniga regarding her allegations.  Id.  On March 11, 2008, Zuniga filed a charge of Discrimination with the EEOC against SMS.  Id., Ex. S.  On August 11, 2009, Zuniga commenced the present action.  See Docket No. 1.

Based on this timeline, this Court concludes that all documents generated by SMS concerning its investigation of Zuniga's complaint of harassment up to March 11, 2008, the date the EEOC charge was filed, lose their protection under the attorney-client privilege and the work product doctrine, particularly where SMS has offered no evidence to support a claim that this work was done in anticipation of litigation and it is asserting the Ellerth/Faragher defense.  Consistent with that finding, based on the privilege log submitted by SMS, it does not appear that SMS withheld any of the documents generated before the EEOC charge.  What is not as clear, however, is after the EEOC charge was filed, for what purpose was the investigation conducted and were

documents generated.  Stated otherwise, were the documents generated by SMS in connection with its investigation post-EEOC charge prepared in anticipation of litigation as claimed by SMS?   Were they prepared to defend against the charge of discrimination?  Or were they prepared to comply with SMS's policies and procedures for addressing a complaint of harassment?  If SMS had put forth evidence to establish that the investigative work it conducted after March 11, 2008, only addressed the EEOC charge, and SMS had no intention on relying on it in order to prove up the first element of the Ellerth/Faragher defense, this Court could conclude that any work product or attorney-client communications associated with the investigation were not waived.  On the other hand, if the converse is true, then any post-EEOC charge investigation is discoverable by Zuniga either because it was not in anticipation of litigation or was waived.

Here, the Court does not have before it any representation by SMS that it will not rely on the information developed during investigation conducted after the EEOC charge in support of its Ellerth/Faragher defense.[8]   Further, the Rule 30(b)(6) deposition of SMS, established that the investigation of Zuniga's complaint and its response to the EEOC charge were one and the same:

> THE WITNESS: Well, you know, in general, if you're doing an investigation and -- I mean, things do tend to end up in EEOC charges. They can. We may be in midstream or early on and an EEOC charge comes in and, you know, whether somebody still works for us or not, the response is going to be we're going to answer the administrative route and you're

---

[8]     SMS did represent that it did not intend to rely on documents from its investigation of the EEOC charge to support its invocation of the Ellerth/Faragher defense, (SMS Priv. Mem., p. 15 (citing Maxwell Priv. Decl., Ex. G)), but that is not the same as stating that it does not intend to rely on the information it discovered during that investigation and to present that information at trial.

going to get a copy of our response. I mean, there's a -- I don't want to say it's hands off, but we're not going to interact with you about this matter because it's now with an administrative agency, just like you would if there was a lawsuit filed.

BY MS. GAULDING:

     Q. So the posture of the company at that point, once an EEOC charge has been filed, is to defend self from the charge?

     A. Yeah. I mean, yes and no.

MS. MAXWELL: Objection to form.

THE WITNESS: We're going to respond to -- the results of our investigation are going to be proffered to the EEOC as part of our response.

BY MS. GAULDING:

     Q. So is there sort of two tracks going on in this sort of situation where the company is doing its own investigation to find out the facts, but it's also defending itself against the charge in front of the EEOC?

     A. I wouldn't call it two tracks. In this particular case, from having put things together, you know, Debbi's -- Ms. Tannock, excuse me and her file on this sort of got subsumed into the EEOC file because of the way that it unfolded. I mean, they're not separate. I think if you're trying to find out to the best that you can what happened, that's part and parcel of the same thing. I mean, you know, when we respond to an EEOC charge, a large portion of it is here's our understanding of what happened. It's not just the legal part or the defense part. It's these are the facts that there's actually a title of our responses that say the facts that gave rise to this charge. So I mean, that -- that's frequently the result of our investigation. I don't know how it could be otherwise.

Maxwell Privilege Decl., Ex. E (Mayer Dep.), pp. 107-09 (emphasis added).  Indeed,

even SMS acknowledged the "indistinguishable nature of the SMS's investigation in

response to Plaintiff's allegations and its response to her EEOC charge" and the "truly inextricable character of its investigation and it[s] EEOC response. . . ."  See SMS Priv. Mem., p. 3; pp. 10-11 (discussing intertwined nature of its investigation of internal investigation of Zuniga's complaint and responding to the EEOC charge); p. 12 ("In spite of the fact that Plaintiff's silence deprived SMS of conducting an investigation distinguishable from its response to the EEOC Charge, ....")

Based on the above testimony and concession of SMS that the investigation conducted after the filing of the EEOC charge was conducted to meet both its obligation to take timely and appropriate action to address a complaint of harassment and to respond to the EEOC charge, and where SMS intends to rely on the information it developed from this investigation to establish the first prong of the Ellerth/Faragher defense, Zuniga is entitled to a full disclosure of those documents and communications underlying that investigation to test the reasonableness of its investigation.

The Court recognizes that SMS believes that it has provided Zuniga with enough documents to prove that its sexual harassment policy was reasonable and properly enforced.  See SMS Priv. Mem., p. 9.  That is not the test.  Once SMS put the reasonableness of its investigation at issue, then full disclosure of its contents is required, not just the evidence that SMS selects.  See Musa-Muaremi, 270 F.R.D. at 319.  On the other hand, the Court finds no waiver of the attorney-client privilege or work product doctrine as it relates to documents generated by SMS since the filing of or during this litigation, as any investigation on the part of SMS in response to Zuniga's suit has no bearing on the Ellerth/ Faragher defense.

55

Therefore, based on this Court's determination that Zuniga is entitled to all documents generated and collected by SMS in connection with its investigation of Zuniga's complaint of harassment up to the commencement of this suit. and based on its in camera inspection of the documents provided by SMS, the Court concludes that the following documents shall be produced to Zuniga without any redaction, unless otherwise specified, as they relate to SMS's investigation of Zuniga's complaint of harassment:[9]

- SMS-PRIV-000002-000063

- SMS-PRIV-000145-000152

- SMS-PRIV-000158-000160

- SMS-PRIV-000161, SMS-PRIV-0000605, SMS-PRIV-0000608, SMS-PRIV-0000609, SMS-PRIV-0000610: June 10, 2008 12:38 PM and June 10, 2008 1:38 PM emails from Kumbro to Mayer dealing with the ER Update concerning the paragraph starting with "Latisha ???????" The remainder of the email chain and the employer update may be redacted by SMS as it does not pertain to this Zuniga's claim and instead deals with other employees.

- SMS-PRIV-000162-000164

- SMS-PRIV-000561-000562

- SMS-PRIV-000564-000565

---

[9]     This Court rejects SMS's contention that any documents containing opinion work product are entitled to absolute protection.  See SMS's Priv. Mem., p. 8.  When waiver occurs, it does not differentiate between attorney-client privilege, work product, or any other privilege.  Waiver is just that—waiver.  See Minnesota Specialty Crops, Inc., 210 F.R.D. at 677 (finding even the nearly absolute immunity of attorney-opinion work product may be lost if a client places his attorney's opinions into direct issue.); McGrath, 204 F.R.D. at 246 ("Secondly, while the Court finds the waiver of some core work product difficult to sustain, it agrees that NHCC's invocation of the Faragher-Ellerth defense has waived the work product privilege under the facts of this case.").  In any event, SMS has not identified which of its entries are opinion work product, as opposed to fact work product and has provided no affidavit  to support a claim of opinion work product.  SMS has the burden to assert the doctrine and that burden has not met.

- SMS-PRIV-000579-000589[10]

- SMS-PRIV-000590-000593: May 19, 2008 9:19 and 10:19 AM emails from Zander to Mayer concerning the third (last) paragraph and the May 19, 2008 10:32 AM email from Mayer to Zander concerning the second paragraph starting with "The case involving Marco is Zuniga v SMS."   The remainder of the emails on these documents may be redacted by SMS as they do not deal with Zuniga's claims.

- SMS-PRIV-000594-601

- SMS-PRIV-000603-604

- SMS-PRIV-000611-12:  SMS shall produce the email and the part of the attachment regarding the June 9, 2008 Minutes including the attendees of the conference call and the portion of the ER Update dealing with Zuniga.   The remainder of the ER Update may be redacted by SMS as it deals with other employees and other matters unrelated to Zuniga.

- SMS-PRIV-000613-619

- SMS-ESI-000422

- SMS-ESI-000425

- SMS-ESI-000893

- SMS-ESI-000896

- SMS-ESI-000907

- SMS-ESI-000935[11]

**C.     Claw Back as to SMS-ESI-000775-776, 000791-000792 and Metadata**

---

[10]     This Court notes that  SMS-PRIV-000579-000580 were not listed on the privilege log, but were instead added to the in camera inspection by Zuniga in her December 15, 2010 letter to the Court, as authorized by this Court's December 3, 2010 Order.

[11]     Based on the Court's findings that Zuniga is entitled to a full disclosure of those documents and communications underlying the investigation SMS conducted after the filing of the EEOC charge, the Court need not address Zuniga's contention that SMS disclosure of privileged documents amounted to a subject matter waiver of the remaining documents or her claim of substantial need.

In its December 21, 2010 Privilege Log, SMS indicated that it was seeking to "claw back" SMS-ESI-000775-776, 000791-000792, and metadata from a number of documents that were inadvertently produced pursuant to Fed. R. Civ. P. 26(b)(5).

Under Rule 502(b) of the Federal Rules of Evidence, an inadvertent disclosure of a privileged document does not operate as a waiver if: "(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)."  The party asserting privilege has the burden of proving he has satisfied the requirements of Rule 502(b). See Heriot v. Byrne, 257 F.R.D. 645, 658 (N.D. Ill. 2009).  The Court has before it no competent evidence that the disclosure of these documents was inadvertent, SMS took reasonable steps to prevent their disclosure, or took reasonable steps to rectify the error.  As such, SMS has not met its burden to claw back SMS-ESI-000775-776 and 000791-000792.

### D.    Training Materials and Executive Order

Zuniga claimed that SMS improperly redacted portions of its training materials and an Executive Order/Affirmative Action Program.  See Pl.'s Priv. Mem., pp. 5-6.  At the hearing, SMS represented that portions of these documents were redacted as they did not relate to the claims of sexual harassment and retaliation.  The Court has reviewed the unreacted training materials (SMS-ESI-000001-000058); the Executive Order/Affirmative Action Program (SMS-ESI-000059-000136); the email regarding the distribution of employee handbooks; (SMS-ESI-000139-000149); and the employee relations materials (SMS-ESI-000150-000214) and compared them to those redacted

versions produced to Zuniga.  <u>See</u> Gaulding Priv. Decl., Exs. H, I, J.  Based on this review, this Court concludes that SMS properly redacted portions of these documents as being non-responsive to the issues in the present case except for SMS-ESI-000003-14, which deals with disciplining an employee; and SMS-ESI-000032-45, which deals with conducting an investigation into harassment.  Both of these sets of documents are relevant to how SMS dealt with (or should have dealt with) Gonzalez and their investigation of sexual harassment as it relates to Zuniga.  As such, SMS shall produce unredacted copies of SMS-ESI-000003-14 and SMS-ESI-000032-45 to Zuniga.  Zuniga's motion to compel concerning the production of any other training related materials is denied.

### E.    Additional Arguments Raised by Zuniga

After the conclusion of the hearing on the present motion, the Court ordered SMS to deliver to the Court and Zuniga a revised privilege log listing the documents that it was submitting to the Court for the in camera review, including those documents that Zuniga sought to have the Court review as part of the inspection.   Order dated December 3, 2010, p. 2 [Docket No. 2].  The Court also ordered Zuniga to submit to the Court and SMS a revised privilege log, identifying which documents she was challenging, the basis for her challenge (<u>i.e.</u> why she believes SMS has wrongly withheld the document and why the document should be produced), including that any asserted privilege has been waived because the document had already been produced.  <u>Id.</u>, p. 3.  In her response to SMS's Privilege Log Provided Dec. 21, 2010, Zuniga raised additional arguments not found in her initial memoranda or reply concerning why she believed that the documents should not be withheld including: the withheld documents

dealt with third-party correspondence—entry numbers (9) (51) (58) (61) (67) (71) (80) (94) (96) (97); a communication with an employee who was not a client pursuant to Upjohn—entry numbers (16) (43) (88) (109) (111) (113) (127); the log was inadequate to support the privilege asserted—entry numbers (19) (28) (36) (46) (49) (52) (60) (79) (91) (95) (101) (106) (108) (110) (117) (126); no attorney was involved in the communication—entry numbers (20) (26) (90) (118); and the communication involved a third party—entry numbers (23) (38) (98) (100) (103) (107) (112) (128).   Zuniga also included the Declaration of Jonathan J. Dahl in Support of Plaintiff's Motion to Compel Documents Listed on SMS's Privilege Log, as part of her response.

The Court has compared the privilege log provided by SMS on December 21, 2010 with SMS's October 25, and November 5, 2010 privilege logs (Gaulding Priv. Decl., Exs. C, D), and concluded that almost all of the categories listed above were the same ones listed in October and November privilege logs, save for entry numbers 107, 109 in part, and 118, which were covered in the privilege log produced by SMS via email on November 16, 2010. See Gaulding Priv. Decl., Ex. E.

When this Court invited Zuniga to identify the basis for objecting to SMS's withholding of documents, it was not inviting Zuniga to raise additional grounds for their production.[12] To allow Zuniga to do so greatly disadvantage SMS, as it had no way to respond.  Further, the Court finds that because most of the entries in the logs produced by SMS on November 5 and November 18, 2010 were the same as the December 21, 2010 privilege log, and contained sufficient information as to the identity of the authors and recipients, Zuniga could have raised these arguments in her initial moving papers

_____

[12]   In fact, the Court explicitly informed Zuniga's counsel that it did not want a new brief.

or in her reply.  Therefore, the Court will not consider Zuniga's belated attempt to raise these issues.  As to entry numbers 107, 109 in part, and 118, while the complete entries were not provided until November 16, 2010, and Zuniga's brief was due on the November 17, given the few entries at issue and the paucity of her objections, this Court finds that Zuniga could have addressed these entries in her subsequent reply brief which was filed on November 29, 2010.  As such, the Court will not consider any of these additional arguments raised by Zuniga as part of her response to the December 21, 2010 privilege log.

**F.    Conclusion**

In summary, SMS shall produce the following documents in their entirety and without redaction to Zuniga, unless otherwise specified.

- SMS-PRIV-000002-000063

- SMS-PRIV-000076-000078

- SMS-PRIV-000145-000152

- SMS-PRIV-000158-000160

- SMS-PRIV-000161, SMS-PRIV-0000605, SMS-PRIV-0000608, SMS-PRIV-0000609, SMS-PRIV-0000610: June 10, 2008 12:38 PM and June 10, 2008 1:38 PM emails from Kumbro to Mayer dealing with the ER Update concerning the paragraph starting with "Latisha ???????" The remainder of the email chain and the employer update may be redacted by SMS as it does not pertain to this Zuniga's claim and instead deals with other employees.

- SMS-PRIV-000162-000164

- SMS-PRIV-000561-000562

- SMS-PRIV-000564-000565

- SMS-PRIV-000579-000589[13]

- SMS-PRIV-000590-000593: May 19, 2008 9:19 and 10:19 AM emails from Zander to Mayer concerning the third (last) paragraph and the May 19, 2008 10:32 AM email from Mayer to Zander concerning the second paragraph starting with "The case involving Marco is Zuniga v SMS."   The remainder of the emails on these documents may be redacted by SMS as they do not deal with Zuniga's claims.

- SMS-PRIV-000594-601

- SMS-PRIV-000603-604

- SMS-PRIV-000611-12:  SMS shall produce the email and the part of the attachment regarding the June 9, 2008 Minutes including the attendees of the conference call and the portion of the ER Update dealing with Zuniga.   The remainder of the ER Update may be redacted by SMS as it deals with other employees and other matters unrelated to Zuniga.

- SMS-PRIV-000613-619

- SMS-ESI-000003-14

- SMS-ESI-000032-45

- SMS-ESI-000422

- SMS-ESI-000425

- SMS-ESI-000775-776

- SMS-ESI-000791-000792

- SMS-ESI-000893

- SMS-ESI-000896

- SMS-ESI-000907

- SMS-ESI-000935

---

[13]     This Court notes that  SMS-PRIV-000579-000580 were not listed on the privilege log, but were instead added to the in camera inspection by Zuniga in her December 15, 2010 letter to the Court, as authorized by this Court's December 3, 2010 Order.

Zuniga's motion to compel disclosure of the following documents listed on SMS's privilege log are denied as to the documents listed in the following entries of the privilege log: 11-28, 30-31, 35-119, 126-128, 129 (except for SMS-ESI-000003-14 and SMS-ESI-000032-45), 130-132, 133 (except for SMS-ESI-000422 and 000425), 134 (except for SMS-ESI-000775-776), 137 (except for SMS-ESI-000893 and 000896), 138 (except for SMS-ESI-000907), and 139 (except for SMS-ESI-000935).

## IV.  PLAINTIFF'S MOTION TO COMPEL AND FOR SPOLIATION SANCTIONS [DOCKET NO. 331] AND PLAINTIFF'S MOTION FOR EXTENSION OF TIME TO FILE MEMORANDUM [DOCKET NO. 334]

### A.    Plaintiff's Motion for Extension Time to File Memorandum

Zuniga moved the Court for permission to file her Memorandum of Law in Support of Motion to Compel and for Spoliation Sanctions after midnight on February 10, 2011, the date it is due under D. Minn. Local Rule 7.1(a), and prior to 6:00 a.m. on February 11, 2011.  See Docket No. 334.  Zuniga's motion for an extension was entered by attorney Stratton on February 11, 2011 at 12:01 a.m.  The memorandum of law was filed on February 11, 2011 at 7:32 a.m.

Zuniga's counsel has developed a pattern of practice of late filings in this case, and then seeking forgiveness.  See e.g. Section I.A., supra.  While the Court appreciates that her attorneys work for a nonprofit legal organization and may be thinly staffed, like all other litigants (including even pro se parties) her attorneys are expected to follow the rules of this Court.  Nevertheless, defendants have not established prejudice because of Zuniga's filing of the memorandum of law at February 11, 2011 at 7:32 a.m., as opposed to filing it at 11:59 p.m. on February 10, 2011.  Lacking any showing of prejudice, the Court will grant Zuniga's motion for an extension.  However,

Zuniga's counsel is on notice that any further late fillings on behalf of their client will likely result in sanctions being leveled against them, including but limited to rejection of filings or monetary sanctions.

### B.    Motion to Compel and For Spoliation Sanctions[14]

Zuniga has renewed her motion to compel electronically stored information ("ESI") and for sanctions in order to obtain permission from the Court to gather additional evidence relating to how defendants preserved electronic and paper discovery and how they went about searching for responsive discovery, especially as it related to ESI.   According to Zuniga, she needs this evidence to determine whether defendants have spoliated evidence.

It is axiomatic to all litigation that once a party is in litigation or has a reasonable basis to believe that it will be in litigation, it has a duty to preserve documents, including

---

[14]    SMS argued that there was no proper meet and confer between it and Zuniga prior to bringing the present motion to compel and for spoliation. See Defendants SMS Holdings Corporation and Service Management Systems, Inc.'s Response to Plaintiff's Motion to Compel and for Spoliation Sanctions ("SMS Spoliation Mem."), pp. 7-8 [Docket No. 356]. Zuniga disagrees, stating that her counsel made efforts to confer with counsel for SMS over the phone about the substance of her motion, SMS's counsel refused to confer by phone, and instead requested Zuniga's attorneys put their concerns in writing, which they did do in advance of the filing of their motion. See Reply Memorandum in Support of Motion to Compel and fro Spoliation Sanction [Docket No. 363], pp. 1-2 (citing Stratton Declaration dated February 22, 2011 ("Stratton Feb. 22 Decl.") [Docket No. 365] at ¶¶ 3-23. Having considered the submissions of both parties, the Court finds that the parties did confer about the issues raised in this motion. Nevertheless, the Court observes that the writing campaign between counsel, while useful to confirm positions or make a record for future motions, was completely ineffective as a process to reach understanding and compromise. In the future, in order to meet the spirit and intention of the "meet and confer" requirement, counsel shall speak to each other in person or over phone to attempt to resolve their discovery disputes. Any written communications submitted to the Court about discovery disputes shall be used solely to confirm the agreements reached or not reached following the conversations.

those documents in an electronic format, that may bear on the claims, defenses or subject matter of the dispute.  See Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 218 (S.D.N.Y. 2003); see also E*Trade Secs. LLC v. Deutsche Bank AG, 230 F.R.D. 582, 588-89 (D. Minn. 2005).   This preservation duty extends to all "key players" in the anticipated litigation.  Zubulake, 220 F.R.D. at 218.

As the court in E*Trade Secs, LLC explained:

> The obligation to preserve evidence begins when a party knows or should have known that the evidence is relevant to future or current litigation. See Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 746 (8th Cir.2004); see also Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y.2003). If destruction of relevant information occurs before any litigation has begun, in order to justify sanctions, the requesting party must show that the destruction was the result of bad faith. Id.  Bad faith need not directly be shown but can be implied by the party's behavior. For example, the Eighth Circuit has explained that (1) a party's decision to selectively preserve some evidence while failing to retain other or (2) a party's use of the same type of evidence to their advantage in prior instances, may be used to demonstrate a party's bad faith. Stevenson, 354 F.3d at 747-48. In order to determine whether sanctions are warranted when documents have been destroyed due to a company's retention policy prior to litigation, the court must consider: "(1) whether the retention policy is reasonable considering the facts and circumstances surrounding those documents, (2) whether lawsuits or complaints have been filed frequently concerning the type of records at issue, and (3) whether the document retention policy was instituted in bad faith." Id. (citing Lewy v. Remington Arms Co., 836 F.2d 1104, 1112 (8th Cir.1988)).
>
> If, however, the destruction of evidence occurs after litigation is imminent or has begun, no bad faith need be shown by the moving party. Id. When litigation is imminent or has already commenced, "a corporation cannot blindly destroy documents and expect to be shielded by a seemingly innocuous document retention policy." See id. at 749 (quoting Lewy, 836 F.2d at 1112).

230 F.R.D. at 588-89; see also Nicollet Cattle Co., Inc. v. United Food Group, LLC, Civil No. 08-5899 (JRT/FLN), 2010 WL 3546784 at *4 (D. Minn. 2010) (same).

Sanctions for spoliation of the evidence may be imposed under a federal court's inherent disciplinary powers.  See Stevenson, 354 F.3d at 745; Dillon v. Nissan Motor Co., 986 F.2d 263, 267 (8th Cir. 1993).  "[S]anctions are appropriate when a party (1) destroys (2) discoverable material (3) which the party knew or should have known (4) was relevant to pending, imminent, or reasonably foreseeable litigation."  Lexis-Nexis v. Beer, 41 F. Supp.2d 950, 954 (D. Minn. 1999); see also Stevenson, 354 F.3d at 745-46 (finding that sanctions are appropriate for spoliation where the moving party demonstrates that the opposing party destroyed potential evidence).  In addition, the court must conclude that the destruction of evidence prejudiced the moving party in order to issue sanctions against the offending party.  Dillon, 986 F.2d at 267; see also E*Trade Securities LLC, 230 F.R.D. at 592 ("An imposition of sanctions is only merited when the moving party can demonstrate that they have suffered prejudice as a result of the spoliation.") (citing Stevenson, 354 F.3d at 748).

For certain types of sanctions, such as an adverse-inference instruction, a finding of bad faith is necessary, however, "a finding of bad faith is not always necessary to the court's exercise of its inherent power to impose sanctions."  Stevenson, 354 F.3d at 745-47 (citations omitted).  For example, to exclude evidence, a court only must find that the offending party knew or should have known that the evidence was relevant to potential litigation, and a finding of bad faith is not required.  See Dillon, 986 F.2d at 267.

The moving party has the burden to prove spoliation.  See Stevenson, 354 F.3d

at 748.

Zuniga seeks the following remedies to determine the full extent of Gonzalez's

alleged spoliation:

> (1) the opportunity to conduct a limited deposition of
> Gonzalez as soon as practicable regarding his preservation
> (or destruction) of evidence;
>
> (2) access to the forensic copy of Gonzalez's personal
> desktop computer, so that Plaintiff's expert can conduct a full
> forensic analysis, including an assessment of the impact of
> Gonzalez's reinstallation of the operating system and a
> search for any remaining relevant data, not found in
> Gleason's incomplete search[.]

See Plaintiff's Memorandum in Support of Motion to Compel and for Spoliation

Sanctions ("Pl.'s Spoliation Mem."), p. 37 [Docket No. 340].

As for SMS's alleged spoliation, Zuniga seeks the following remedies to

determine the full extent of such conduct:

> (1) access to the data from SMS's servers and backup
> tapes, so that Plaintiff's expert can conduct a full forensic
> analysis, including an assessment of the impact of SMS's
> document-retention-policy-based measures and a search for
> any remaining relevant data, beyond that found by Sherry
> Hick's incomplete search;
>
> (2) additional access to the forensic copy of Gonzalez's SMS
> work computer, so that Plaintiff's expert can conduct a full
> forensic analysis, beyond the incomplete search conducted
> by DSi, and in the interim, the immediate production by SMS
> of all non-privileged evidence generated by DSi (i.e., all "hits"
> from the search terms) during its incomplete analysis;
>
> (3) access to (or the opportunity to create) forensic copies of
> the hard drives of the laptop or desktop computers of key
> SMS employees, such [as] Debbi Tannock, Scott Mayer,
> Mary Ellen Zander, William Stesjkal, James Powell, and
> Robert Williams, so that Plaintiff's expert can conduct a full

> forensic analysis, including an assessment of the impact of any deletions by these employees or SMS and a search for any remaining relevant data (never yet searched for);
>
> (4) the designation by SMS of a witness to respond to the 30(b)(6) topics relating to SMS's efforts to comply with its obligations to locate and preserve evidence regarding non-ESI ("paper") discovery.

Id.  Zuniga also asked that the cost of each of these remedies be shifted to defendants and that she be granted an immediate interim award of fees and costs.  Id.

### 1.     Factual Background as it Relates to Gonzalez

As stated previously, Zuniga brought her EEOC charge against SMS regarding Gonzalez's alleged sexual harassment on March 11, 2008 and initiated the present action on August 11, 2009.

On September 22, 2010, Zuniga filed a motion to compel seeking an order requiring Gonzalez to make available for forensic copying any personal or home computer he used in connection with work at SMS or communications related to the present action.  See Docket No. 211.  That motion dealt with Zuniga's request for ESI, especially as it related to number of memos authored by Gonzalez from April 24, 2006 to January 25, 2008 (collectively "the Gonzalez memoranda"), all of which contained negative information regarding Zuniga that was allegedly obtained by Gonzalez from various sources.  These memos were produced to Zuniga in paper form.  Zuniga believed that Gonzalez had fabricated these memos in order to defend himself from her charges, and that they had not been prepared on the dates reflected on the documents. Consequently, Zuniga propounded discovery to both Gonzalez and SMS to obtain these memos in their native electronic format (including metadata), which Zuniga believed

would reveal when and on what computers the documents were created.  Gonzalez did not produce any ESI in response to this discovery.

In response to Zuniga's September 2010 motion to compel, Gonzalez represented:

> After the lawsuit started, I knew I have to save any evidence I had, including documents on my computer or phone.  I have not deleted any evidence or documents or other information on my computer or phone related to this lawsuit.

See October 1, 2010 Declaration of Marco Gonzalez, ¶ 8 [Docket No. 234].  Gonzalez also represented that his legal counsel communicated to him in September 2009 that he had a duty to preserve ESI, including information from his personal or home computers. See February 17, 2011 Declaration of Marco Gonzalez [Docket No. 351], ¶ 4.

At the hearing on Zuniga's motion to compel on October 14, 2010, this Court learned that Gonzalez had used two different personal computers while employed at SMS – a PC computer at home and his wife's laptop computer – and that Gonzalez's counsel had never taken possession of or examined the hard drives of either computer. Instead, counsel had relied on Gonzalez's representations regarding his search for relevant documents.   Therefore, the Court provided the following relief to Zuniga concerning obtaining ESI from Gonzalez:

> 2.    Gonzalez's counsel shall either take possession of Gonzalez's home PC desk top or make a mirror image of its hard drive. Gonzalez's counsel (or an expert) shall examine this computer or mirror image for responsive documents to plaintiff's document requests (including the Gonzalez memos, and any files, fragments or any information bearing on the deletion of responsive documents) and produce the same to plaintiff. The cost of this examination shall be borne by Gonzalez.

3.     Gonzalez's counsel shall either take possession of Gonzalez's wife's laptop or make a mirror image of its hard drive to the extent that it was in Gonzalez's or his wife's possession at any time during plaintiff's employment with SMS (commencing from the second time plaintiff was employed with SMS, from February of 2007 through the present).  Gonzalez's counsel (or an expert) shall examine this laptop or the mirror image for responsive documents to plaintiff's document requests (including the Gonzalez memos, and any files, fragments or any information bearing on the deletion of responsive documents) and produce the same to plaintiff.  The cost of this examination shall be borne by Gonzalez.  If the laptop is no longer in the possession or control of Gonzalez or his wife (as Gonzalez's counsel represented at the hearing), Gonzalez shall provide to plaintiff a sworn affidavit regarding the present whereabouts of the laptop, when it left his wife's possession, why it left his wife's possession, whether and when he ever examined it for responsive documents to plaintiff's document requests, and whether he conducted any SMS-related work or communications on the laptop.

October 29, 2010 Order, p. 12 [Docket No. 271].

In response to this order, Gonzalez provided an affidavit in which he represented that he had used his wife's laptop to make a copy of a recording by Rolando Hernandez giving a statement regarding Zuniga,[15] but that he did not conduct any other business-related work or communications on the laptop.  See November 5, 2010 Affidavit of Marco Gonzalez [Docket No. 273], ¶¶ 3-5.[16]  As to the whereabouts of his wife's laptop

---

[15]     Gonzalez stated that he had provided this recording to his attorney and had identified a copy of the recording by Hernandez as part of his Rule 26(a)(1) disclosures. November 5, 2010 Gonzalez Affidavit, ¶ 3; see also February 17, 2011 Declaration of Kurt J. Erickson ("Erickson Spoliation Decl."), Ex. E.

[16]     Challenging this representation, both Zuniga and her husband claimed that they had observed Gonzalez working on a "smaller portable computer" at work.  See Declaration of Leticia Zuniga Escamilla in Support of Plaintiff's Motion to Compel and for Spoliation Sanction [Docket No. 336], ¶ 4; Declaration of Abraham Quevado in Support of Plaintiff's Motion to Compel and for Spoliation Sanctions [Docket No. 337], ¶¶ 5-7.

computer, Gonzalez stated that on or around July 2009, it was sent to his wife's sister in Mexico as a gift, it was subsequently sold, and its present location was unknown. See November 5, 2010 Gonzalez Affidavit, ¶¶ 2, 7. Gonzalez stated he did not examine his wife's laptop for responsive documents to Zuniga's requests because the laptop had been sent to Mexico before the suit was begun. Id., ¶ 6.

Pursuant to this Court's Order, on November 16, 2010, Shepard Data Service took custody of Gonzalez's home desktop computer and on November 17, 2010, Zubin Medora made a mirror image of the desktop hard drive. See Defendant Marco Gonzalez's Memorandum in Opposition to Plaintiff's Motion to Compel and for Spoliation Sanctions ("Gonzalez Spoliation Mem."), pp. 5-6. Gonzalez's counsel then retained a consulting firm that specialized in digital forensics and electronic discovery to examine Gonzalez's home computer to determine whether certain key words could be found on the mirror image of the PC, including Leticia, Zuniga, Escamilla, Oswaldo, assault, sex, rape, Abraham, Carlos, Peralta, SMS, Karla, Carla, Perez, SMS 117[17] and Lopez. See Declaration of Jonathan J. Dahl in Support of Motion to Compel and for Spoliation Sanctions ("Dahl Spoliation Dec.") [Docket No. 333], Ex. L (Declaration of Brendan K. Gleason), ¶¶ 2, 6, Attachment B. As part of the investigation, the consulting firm determined that the computer's operating system had been reinstalled on October 5, 2010. Id., ¶ 7.[18] Nevertheless, the key word search yielded 750 key word hits in unknown files or unallocated space, which included searches regarding how to deal with sexual harassment claims and two key word hits for SMS117. Id., ¶¶ 8-10.

---

[17]    SMS 117 referred to Gonzalez's user account at SMS.

[18]    Gonzalez counsel was not aware of this reinstallation at the hearing on October 14, 2010.

On February 8, 2011, Gonzalez's counsel provided to Zuniga's counsel a list of the 750 keyword hits that occurred during the forensic review of Gonzalez's home personal computer. See Declaration of Sarah M. Fleegel in Support of Defendant Gonzalez's Opposition to Plaintiff's Motion to Compel and for Sanctions [Docket No. 353], ¶ 4.

According to Zuniga's computer forensic consultant Mark Lanterman ("Lanterman"), the installation of a computer operating system on a hard drive over-writes the existing files stored on that hard drive, which likely destroyed a significant amount of data and is usually done to hide or destroy relevant information. See Declaration of Mark Lanterman ("Lanterman Decl."), ¶ 8 [Docket No. 335]. Lanterman also opined that the information provided by Gonzalez's computer consultant suggested that the data on Gonzalez's home computer prior to the re-installation of the operating system was now lost, and while it may be possible to find and recover some relevant data, the condition of the hard drive had been permanently altered. Id., ¶ 10.

Gonzalez stated he re-installed the operating system on his home computer in October 2010, at the suggestion of Best Buy's Geek Squad, as his computer was not functioning properly. See February 17, 2011 Declaration of Marco Gonzalez [Docket No. 351], ¶¶ 5-8. Gonzalez further stated that he had searched for documents responsive to Zuniga and her claims prior reinstalling the operating system. Id., ¶ 9. He did not find any documents, except for communications with his legal counsel. Id.

### 2.      Factual Background as it Relates to SMS

On March 11, 2008, Zuniga filed her charge of discrimination with the EEOC.  On March 17, 2008, the EEOC informed SMS that it had a duty to preserve personnel records[19] relevant to the charges brought by Zuniga.  See Declaration of Lisa C. Stratton in Support of Motion to Compel and for Spoliation Sanction [Docket No. 339] ("Stratton Spoliation Decl."), Ex. R (EEOC FOIA 000025).

On April 28, 2008, Gonzalez returned his SMS work computer to SMS upon leaving employment with SMS.  See Stratton Spoliation Decl., Ex. R (EEOC FOIA 000171).

On August 11, 2009, Zuniga filed the Complaint in this action.

On November 10, 2009 this Court issued a pretrial scheduling order which provided in relevant part, "[t]he parties shall preserve all electronic documents that bear on any claims, defense or the subject matter of this lawsuit."  Pretrial Scheduling Order [Docket No. 35], p. 4.

At some point, SMS produced to Zuniga a copy of the Gonzalez memoranda in paper form,

On December 31, 2009, Zuniga served document requests on SMS and again on June 14, 2010, seeking responsive documents including ESI.  SMS responded to this written discovery in March 2010, but produced no ESI.  At the deposition of Gonzalez on March 10, 2010, Gonzalez testified that the Gonzalez memoranda, along with other work-related documents and communications, were prepared on his work computer and

---

[19]     By way of examples, the EEOC described "personnel records relevant to the charge" as "personnel and employment records relating to the aggrieved person and other aggrieved employees holding positions similar to that held or sought by the aggrieved person."  Stratton Spoliation Decl., Ex. R (EEOC FOIA 000025).

were saved there.   Zuniga's attorneys raised with SMS's counsel at Gonzalez's deposition and immediately after the deposition, the need for production of ESI and in particular the Gonzalez memoranda, and the need to preserve Gonzalez's work computer.

SMS's first attempt to locate Gonzalez's former work computer did not occur until April 2010.   See Stratton Spoliation Decl., Ex. A (Emerson Dep.), pp. 39-40.   On April 23, 2010, at the request of SMS, DSi remotely obtained a forensic image of the hard drive to Gonzalez's work computer.   Id., p. 42; see also Declaration of Sarah C. Maxwell in Support of Defendant SMS Holdings Corporation and Service Management System, Inc.'s Response on Opposition to Plaintiff's motion to Compel and for Spoliation Sanctions ("Maxwell Spoliation Decl.") [Docket No. 357], Ex. B (Collection Report from DSi).

On July 5, 2010, for the first time, SMS, through DSi, obtained a forensic mirror image of its file and print server, thereby capturing all documents on the server at the time of the collection, all documents that had been deleted but still resided on the server and all fragments of documents on the server.   See Hicks Spoliation Decl., ¶ 4.   SMS also had in its possession a mirror image of the file and print server that was obtained on February 9, 2009 for an unrelated matter.   Id., ¶ 5.

On October 29, 2010, this Court denied without prejudice Zuniga's request that she be provided with a mirror image of SMS's server and Gonzalez's work computer, and instead provided for the following relief:

74

>Plaintiff shall complete the SMS Rule 30(b)(6) deposition on ESI issues, including what SMS did to preserve information on its server once it received notice of plaintiff's claims, whether there has been destruction or deletion of responsive evidence in the ordinary course of business or for any other reason, what is available on archives and backups, and what SMS did to search the server (including archives and backups) for responsive documents, including the Gonzalez memos.   In addition, plaintiff shall cover during the SMS Rule 30(b)(6) deposition the nature, date and scope of the search SMS conducted on the hard drive of Gonzalez's work computer.  Plaintiff may renew her motion to compel a mirror image of SMS's server and Gonzalez's work computer after completion of the Rule 30(b)(6) deposition if the information she receives so warrants.   Plaintiff shall issue its Rule 30(b)(6) notice as to the topics she wishes to cover at the deposition on or before October 20, 2010.  As part of this notice, she must provide how much time will be needed for the continuation of the Rule 30(b)(6) deposition.

See October 29, 2010 Order, p. 12.

In its Rule 30(b)(6) deposition notice to SMS, Zuniga listed for deposition the following topics concerning SMS's computer systems/databases and its retention practices: (1) types of hardware and software used by SMS; (2) accessibility of computer systems; (3) acquisition, location and disposition of personal computers, smart phones or other devices storing ESI used by employees of SMS and the systems used to record such information; (4) maintenance of hardware and software; (5) the chain of custody of hardware and software, including processes employed when an employee leaves or a computer is reassigned, and replacement and repair of equipment by SMS; (6) the methods by which electronic documents were maintained, archived, and indexed, including descriptions of the hardware and software used by SMS and how this electronic data may be accessed; (7) corporate policies regarding employee use of company computers, software, e-mail and data of SMS; (8) the types of

databases used and how the databases are accessed; (9) the current and prior systems used to create, store, retrieve and delete email, including name, versions, installation dates, number of users and location of user mail files; (10) the software used for storage of backup information, retention of backup data and information as to how data is stored; (11) corporate policies regarding the use of computers and other technology at SMS; (12) electronic records management policies and procedures; (13) the manner in which SMS indexed, organized, and maintained its documents, including their document retention policies "for both electronic and paper documents;" (14) steps taken by SMS and its agents to identify and preserve all forms of ESI and paper evidence relevant to plaintiff's claims, including but not limited to the issuance of any litigation holds; (15) a comparison of ESI relevant to the present matter as it existed in March 2008 with the (a) the ESI that existed on forensic images taken of SMS's servers, and (b) the ESI that existed on forensic images taken from Gonzalez's former SMS work computer; and (16) steps taken by SMS and its agents to locate and produce ESI and paper evidence responsive to plaintiff's discovery requests including the scope of the files searched, the search terms used, and software and methods used to perform the searches.  See Stratton Spoliation Decl., Ex. D (December 2, 2010 Plaintiff's *Corrected* Third Amended Notice of F.R.C.P. 30(b)(6) Depositions).  SMS identified Scott Emerson ("Emerson"), SMS Senior Vice President Administration; Andy Spore ("Spore"), DSi Digital ("DSi") Forensic Analyst; and Robert Golden ("Golden"), DSi I.T. Administrator/Data Collection Specialist to testify regarding these topics.  Id. (SMS Response to Plaintiff's Second Amended Notice of Rule 30(b)(6) Deposition).

### a.    Gonzalez's SMS Work Computer

Emerson testified that facility computers (such as Gonzalez's work computer), have no connection to SMS's network or servers and SMS has no backup policy of these computers. See Stratton Spoliation Decl., Ex. A (Emerson Dep.), pp. 24-25. When facility computers are moved from one facility to another, the ESI from the previous user is deleted and if needed, the computer is reformatted prior to being used by the next user, in order to protect confidentiality. Id., pp. 34-36.

As stated previously, on April 28, 2008, Gonzalez returned his SMS work computer to SMS upon leaving employment with SMS. See Stratton Spoliation Decl., Ex. R (EEOC FOIA 000171). Gonzalez's work computer went through the process of either deleting the user data or reformatting. Id., Ex. A (Emerson Dep.), p. 38. Emerson acknowledged that once this process occurred and the computer was delivered to the new user, any use by the new user will overwrite deleted data in the unallocated space. Id. Gonzalez's former computer was assigned to a shopping center in Texas. Id., p. 39.

Spore, with DSi, testified that the examination of the hard drive of Gonzalez's former computer only yielded one account—SMS 1503. See Stratton Spoliation Decl., Ex. B (Spore Dep.), pp. 58-59. There were only traces of Gonzalez's user account, SMS 117, discovered in the deleted area of the hard drive. Id., pp. 60, 64-65. DSi did not look into any evidence or trail of any wiping, cleaning or other utility that could delete ESI. Id., p. 99. DSi searched the forensic image of the hard drive, including deleted data, using a key word list comprised of the names of the parties, relevant locations, and slang terms for sex acts in both English and Spanish. See Declaration of Sherry

77

Hicks in Support of Defendants SMS Holdings Corporation and Service Management System, Inc. Response to Plaintiff's Motion to Compel Electronically Stored Information [Docket No, 243], ¶¶ 6-7; see also Declaration of Sarah C. Maxwell in Support of Defendants SMS Holdings Corporation and Service Management System, Inc.'s Sur-Reply in Opposition to Plaintiff's Reply in Support of her Motion to Compel and for Spoliation Sanction [Docket No. 375] ("2nd Maxwell Spoliation Decl."), Ex. B (list of search terms used in searching Gonzalez hard drive).[20]

In light of SMS's failure to preserve Gonzalez's work computer (or the hard drive of the computer) and the importance of determining when the Gonzalez memoranda were prepared, the Court allowed Lanterman, Zuniga's computer consultant, to search the mirror image of Gonzalez's work computer hard drive.   In so doing, this Court stated:

> the sole purpose of permitting him to examine the hard drive for the presence of the Gonzalez's allegedly fabricated memos.  If Lanterman finds any such documents, files or fragments of these documents or any information bearing on their deletion, this material shall be delivered by Lanterman to SMS's counsel for review for privilege and confidentiality. All non-privileged material shall then be produced to plaintiff.

October 29, 2010 Order [Docket No. 271].

As a part of his examination, Lanterman concluded that DSi did not collect all of the data off Gonzalez's work hard drive, as it collected a logical image and not a physical image of the hard drive.  See Stratton Spoliation Decl., Ex. U (November 12, 2010 Forensics Service Report), p. 3.  Lanterman also opined that potentially relevant

---

[20]    The Court permitted SMS and Gonzalez to submit a sur-reply opposing Zuniga's for discovery and spoliation sanctions.  SMS and Gonzalez's request for attorney's fees incurred to prepare these memoranda and supporting materials is denied.

documents (2007 Leticia Zuniga Emp File.pdf and Leticia Escamilla.pdf) were produced on a CD on the computer, and that there were several potentially relevant data fragments that were responsive to the search criteria provided, but not related to the disputed memos that Lanterman was instructed to find on the hard drive. Id., pp. 4-5.

### b.   Emails

At the Rule 30(b)(6) deposition, Zuniga learned that SMS uses a Microsoft Exchange E-mail server for its corporate email. See Stratton Spoliation Decl., Ex. A (Emerson Dep.), p. 14.   Gonzalez was a "POP3" user, meaning that his emails were only temporarily kept on the exchange server. Id., p. 15.   When a POP3 user logs onto their email account, their emails are downloaded onto the machine where the log-in occurred, at which point they are removed from the Exchange server. Id.   A minority of users are on Outlook Client and have their email stored on the Exchange server, even after the user has read or managed the email. Id., pp. 14-15.   Throughout the period of 2007-2008, SMS archived emails maintained on the servers on back-up tapes and only saved these monthly backup tapes for a 12-month period, at which point the oldest tape would be reused and all data on the tape was recorded over. Id., pp. 18-19.   Emerson testified that SMS had the monthly back-up tapes for the Exchange server dating back to October 2007. Id., p. 21.   On July 5, 2010, SMS obtained a forensic image of its servers, and captured all data, deleted documents still on the server, and fragments of all documents on the server at the time of collection, and sometime after July 11, 2010, SMS searched the Outlook data for individuals it believed were relevant custodians in this suit, as well as data from the backups of workstations of those individuals that had left SMS. See Declaration of Sherry Hicks in Support of Defendants SMS Holdings

Corporation and Service Management System, Inc.'s Response to Plaintiff's Motion to Compel and for Spoliation Sanctions [Docket No. 358] ("Hicks Spoliation Decl."), Ex. A (Hicks October 1, 2010 Decl.), ¶¶ 10, 12, 17.

SMS had identified for Zuniga a list of custodians that it believed had relevant discovery.  See Maxwell Spoliation Decl., Ex. I (July 11, 2010 email from Maxwell to Stratton and Gaulding listing the following "relevant custodians:" Lem Hicks, Dan Owns, Debbi Tannock, Mike Dugan, James Powell, Scott Mayer, Mary Ellen Zander, Robert Williams, Rick Wartham and Marco Gonzalez).   In addition, SMS asked Zuniga's counsel if she intended to provide a list of search terms.  Id.  There is no evidence that Zuniga asked that SMS search the records of additional custodians or suggested any search terms.  The recovered Outlook data was searched using a list of search terms. See 2nd Maxwell Spoliation Decl., ¶ 7, Ex. C (list of search terms used).

### c.    ESI Generated by SMS Corporate Level Employees

Emerson testified at the Rule 30(b)(6) deposition that SMS corporate level employees have the choice of storing their ESI on the corporate file and print server or their individual computer hard drives.  See Stratton Spoliation Decl., Ex. A (Emerson Dep.), pp. 88-89.  The unofficial policy of SMS is to have corporate employees save their work to the server.  Id., p. 89.  The ESI on the file and print server was placed on back-up tapes for a 12-month period and then overwritten.  Id., pp. 18-19.  Emerson testified that SMS had back-up tapes for the file and print server dating back to December 6, 2007.  Id., p. 21.  On July 5, 2010, for the first time, SMS, through DSi, obtained a forensic mirror image of its file and print server, thereby capturing all documents on the server at the time of the collection, all documents that had been

80

deleted but still resided on the server and all fragments of documents on the server. See Hicks Spoliation Decl., ¶ 4.  SMS also had in its possession a mirror image of the file and print server that was obtained on February 9, 2009 for an unrelated matter.  Id., ¶ 5.

In order to locate documents responsive to Zuniga's document requests, the data within SMS's servers was broken down by department and topics, and then in addition, the folder for the Human Resources Department was examined, and within that folder any subfolders with a title that indicated that it contained relevant information were extracted and added to an electronic data examination tool.  Id., ¶¶ 6-7, Ex. A, ¶¶ 10-16. The data extracted from the 2009 and 2010 mirror images of the server were searched using a list of search terms.  See 2nd Maxwell Spoliation Decl., ¶ 7, Ex. C (list of search terms used).

In looking for responsive information, SMS only searched the file and print server, but has not searched any of the individual corporate employee's computers. See Stratton Spoliation Decl., Ex. A (Emerson Dep.), p. 88.  It is not clear from the evidence provided by the parties whether SMS retrieved and searched backups of its file and print server.

### 3.    Search for and Recovery of ESI by Gonzalez

On September 22, 2010, Zuniga filed a motion to compel seeking an order requiring Gonzalez to make available for forensic copying any personal or home computer he used in connection with work at SMS or communications related to the present action.   See Docket No. 19.   Gonzalez acknowledged that as early as September 2009, he was on notice from his legal counsel that he had a duty to preserve

ESI, including information from his personal or home computers.  See February 17, 2011 Declaration of Marco Gonzalez [Docket No. 351], ¶ 4.  On November 10, 2009, this Court ordered Gonzalez to preserve all ESI that bearing on the claims, defenses or subject matter of the lawsuit.  See Pretrial Scheduling Order [Docket No. 35], p. 4.  In response to Zuniga's September 22, 2010 motion to compel, Gonzalez represented that:

> After the lawsuit started, I knew I have to save any evidence I had, including documents on my computer or phone.  I have not deleted any evidence or documents or other information on my computer or phone related to this lawsuit.

See October 1, 2010 Declaration of Marco Gonzalez, ¶ 8 [Docket No. 234]. Notwithstanding all of these directives and representations by Gonzalez, on October 5, 2010, Gonzalez reinstalled his computer's operating system,  See Dahl Spoliation Decl., Ex. L, (Declaration of Brendan K. Gleason), ¶ 7.  While Gonzalez argued that Zuniga has provided no evidence that he destroyed any relevance evidence  (see Defendant Marco Gonzalez's Memorandum in Opposition to Plaintiff's Motion to Compel and for Spoliation Sanction ("Gonzalez Spoliation Mem."), p. 1), the fact is that due to his actions, neither Zuniga nor this Court will ever know – he sent his wife's laptop to Mexico and reinstalled the operating system on his home computer right after Zuniga served her motion seeking to have the computer's hard drive searched.  Further, while Gonzalez professes ignorance and innocent reasons for his actions, the Court finds that given the timing of his actions and Lanterman's testimony that reinstallation of an operating system is done in many cases to hide or destroy relevant information, (see Lanterman Decl., ¶ 8), Gonzalez's conduct warrants allowing Zuniga to do her own

82

investigation of his personal computer. As such, Zuniga's expert, Lanterman, shall be permitted to conduct a full forensic analysis of the hard drive image taken of Gonzalez's personal computer, including an assessment of the impact of Gonzalez's reinstallation of the operating system and a search for any remaining relevant data, including images.[21] The cost for Lanterman's review will be borne by Gonzalez, as it his actions that destroyed the contents of his computer. As for any documents or evidence of deleted documents discovered by Lanterman on Gonzalez's personal computer as part of his analysis, they shall first be provided to Gonzalez so his attorney can review the documents or data for information that is privileged or covered by the work-product doctrine. Gonzalez shall then produce any unprivileged documents or data found by Lanterman to Zuniga, along with a privilege log. Under <u>no</u> circumstances shall Lanterman directly produce any documents or evidence of deleted documents obtained from his review to Zuniga or her counsel.

In addition, Gonzalez shall resubmit to a deposition by Zuniga, and he shall bear the expense of this deposition, including the cost of the court reporter and Zuniga's attorney's reasonable attorney's fees expended in preparation for and the taking of his deposition. While the Court acknowledges that Gonzalez has already submitted to a seven-hour deposition, his conduct dictates that he be deposed again regarding his personal computer and wife's laptop. The topics Zuniga may explore with him shall be confined to the use, examination and re-installation of operating system to his personal computer by him or others, and the use, examination and disposition of his wife's laptop computer by him or others. These topics may include: (1) for what purposes he used

---

[21] If Lanterman did not retain a copy of the mirror image of Gonzalez's computer, then the mirror image shall be produced to him by July 5, 2011.

his home computer and the laptop; (2) what was on laptop prior to it being sent to Mexico; (3) what was on his home computer's hard drive prior to the reinstallation of the operating system; (4) why he sent the laptop to Mexico; and (5) why he reinstalled the operating system on his laptop.

### 4.    Search for and Recovery of ESI by SMS

It is SMS's position that Zuniga is not entitled to the relief she seeks because she has failed to show that any destroyed evidence would have been helpful in proving her claims.  See SMS Spoliation Mem., pp. 10, 13, 16.  In addition, SMS took issue with the notion that the ESI discovery standard in a harassment case is that an employer must retain any and all documents generated by anyone within or outside the company relating to or pertaining to Zuniga.  Id., p. 13.  As to the different sources of ESI, SMS argued: (1) it did not know that Gonzalez used his home computer or his personal laptop for work;[22] (2) Zuniga has not pointed to any evidence to show that Gonzalez, Zuniga or any other SMS employee received an email relating to the allegations in this case to show that SMS acted in bad faith by not putting a litigation hold on all of its company's computers; (3) Zuniga has not alleged that any documents relating to this case were downloaded to SMS's corporate file and print server, given that Gonzalez's computers were never connected to the servers; (4) Zuniga has not alleged that Gonzalez sent or received any email relating to her harassment claims that would have been logged on SMS's corporate exchange server back-up tapes, which in any event, have been already searched and responsive documents produced; and (5) Gonzalez's

---

[22]     This Court agrees that it cannot order SMS to conduct any search of this computer as it is not their property nor is it in their possession or control.

SMS desktop was not secured when they first learned about Zuniga's EEOC charge in March 2008, as the issue of ESI was not prevalent in 2008 and putting Gonzalez's computer back into circulation was normal practice on its part.  Id., pp. 15-16.

This Court finds that SMS did not take timely steps to preserve ESI on Gonzalez's work computer, its file and print server, its email exchange server, and the hard drives of the key custodians' computers.  In fact, to this date, this Court does not know what steps, if any, SMS has taken to preserve the hard drives of the custodians' computers.  Further, the Court finds SMS's failure to search the computers of key corporate employees is both unexplained and unacceptable, and SMS's Rule 30(b)(6) designees were not adequately prepared to testify as to all topics listed in the notice of deposition.  Therefore, Zuniga's motion to compel as it relates to SMS is granted in part as set forth below.

### a.   Preservation of ESI

"The initial determination the court must make is a determination of when the defendant's duty to preserve evidence was triggered."  E*Trade Secs, LLC, 230 F.R.D. at 587 (citing Zubulake, 220 F.R.D. at 216.)  As stated previously, on March 11, 2008, Zuniga filed her charge of discrimination with the EEOC; on August 11, 2009, she commenced the instant action; and on November 10, 2009, this Court issued a pretrial scheduling order which directed "[t]he parties [to] preserve all electronic documents that bear on any claims, defense or the subject matter of this lawsuit."  Pretrial Scheduling Order [Docket No. 35], p. 4,  Under this timeline, this Court finds that SMS's duty to preserve relevant documents was triggered as early as March 11, 2008, when Zuniga filed her charge, as that is the date that SMS has asserted the work product privilege

85

attached, and certainly no later than August 2009, when she commenced her suit.  Yet, SMS took no steps to preserve Gonzalez's work computer at either time.  Instead, it was not until April 2010, that SMS located and preserved Gonzalez's work computer, and it took no steps to preserve the information on the SMS file and print server and email Exchange server until July 2010.  In short, SMS cannot have it both ways.  It cannot assert that it was anticipating litigation as early as March 2008, upon the filing of the EEOC charge, and then maintain it had no duty to preserve documents bearing on that anticipated litigation.  See Sanofi-aventis Deutschland GmbH v. Glenmark Pharmaceuticals Inc., No. 07-CV-5855 (DMC-JAD), 2010 WL 2652412 at *6 (D.N.J. July 1, 2010) ("A party claiming work-product immunity bears the burden of showing that the materials in question were prepared in the course of preparation for possible litigation.  Therefore, Defendants duty to impose a litigation hold and to institute legal monitoring for purposes of compliance arose no later than [the date they asserted the work product immunity on their privilege log.]") (internal quotation marks and citations omitted)); Broccoli v. Echostar Communications Corp., 229 F.R.D. 506, 511 (D. Md. 2005) (finding that that the duty to preserve attached to date when grievances were communicated to an employer) (citing Zubulake, 220 F.R.D. at 217).  And to this date, the Court does not know if SMS has taken any steps to preserve the ESI on the individual computers of the key witnesses in this case.  See Stratton Spoliation Decl., Ex. A (Emerson Dep.), p. 88.[23]  As a result, information that may be germane to the

_____

[23]    The relevant testimony by Emerson was as follows:

    Q    So at any point did you do any –or anyone you direct, anyone at SMS, to your knowledge, look at the individual

claims, defenses and subject matter of this action may have been lost.   More remarkably, as of December 2, 2010, there still had been no litigation hold by SMS to preserve records relating to this suit.  Id., Ex. A (Emerson Dep.), pp. 116-17.

SMS's cavalier attitude towards its duties to preserve potentially relevant information and to comply with this Court's explicit order to preserve ESI cannot be countenanced.  It is true that "a corporation, upon recognizing the threat of litigation, [does not need to] preserve every shred of paper, every e-mail or electronic document, and every backup tape[.]"  Zubulake, 220 F.R.D. at 217.  But here, SMS took no steps as of March 2008, August 2009 or even in November 2009 "to preserve [ESI] . . . it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."  Id., (citations omitted). Further, SMS's attempt to plead ignorance in March 2008 regarding the importance of preserving electronic records is rejected out-of-hand when the 2006 amendments to Rules 26 and 34 of the Federal Rules of Civil Procedure expressly addressed the parties' obligations to produce ESI.  See Fed. R. Civ. P. 26(a)(1)(A)(ii) (requiring initial disclosure of all ESI "used to support claims or defenses"); Fed. R. Civ. P. 26(f)(C) (directing parties to confer regarding ESI, "including the form or forms in which it should be produced."); Fed. R. Civ. P. 26, Advisory Comments (2006) ("A party's identification of sources of electronically stored information as not reasonably accessible does not

---

> hard drives or data on individual PCs within the corporate offices?
>
> A.     Not individual PCs, no.

relieve the party of its common-law or statutory duties to preserve evidence."); Fed. R. Civ. P. 34 (including ESI within the scope of documents to be produced).

SMS's failure to preserve ESI warrants requiring SMS to conduct additional searches for relevant information at its own expense as described below.

**b.      Search of Computers of Key Employees**

Emerson testified that SMS corporate level employees have the choice of storing their ESI on the corporate file and print server or their individual computers' hard drives. See Stratton Spoliation Decl., Ex. A (Emerson Dep.), pp. 88-89.   In looking for responsive information, SMS only searched the file and print server, but not any of the individual corporate employee's computers.  Id., p. 88.  SMS's failure to search the hard drives of the computers of those key employees who may have responsive documents is unacceptable, particularly where employees can choose where to store their ESI. Zuniga has identified the key corporate employees as Debbi Tannock, Mary Ellen Zander, Scott Mayer, James Powell, William Stesjkal, and Robert Williams.  See Pl.'s Spoliation Mem., pp. 28, 37.  Given that SMS has not examined the hard drives of these employees, who based on this Court's review of the record have generated or received ESI pertaining to this case, at its own expense, SMS shall obtain the mirror images of the hard drives of the work computers for each of these individuals and shall search these computers using appropriate search terms for documents generated prior to commencement of Zuniga's suit.  To develop this list of search terms, counsel for the parties shall meet and confer on or before July 11, 2011, to develop and reach agreement on a list of terms to be used in the search of the hard drives.  To the extent the parties cannot agree on the search terms to be used, they shall each submit to the

Court on or before July 11, 2011, their own list of search terms, along with a letter, no more than three pages in length, setting forth why their proposed terms should be used and the other parties' list of terms be rejected.  The Court will then arrive at a final list of search terms.  SMS shall conduct and complete a search of the computers of Debbi Tannock, Mary Ellen Zander, Scott Mayer, James Powell, William Stesjkal, and Robert Williams, and produce to Zuniga documents responsive to her document requests by July 25, 2011, if the parties agree on the search terms, or within two weeks after this Court's issuance of the list of search terms.  At the same time, any documents withheld on the basis of the work product doctrine or attorney-client privilege shall be identified on a privilege log for Zuniga.[24]

### c.      Search of the File and Print Server

Zuniga has requested that she be given access to the data from SMS's servers and backup tapes for the purpose of allowing her expert to conduct a full forensic analysis.  In support for this request, Zuniga cited to Lanterman who provided in his Declaration:

> In reviewing the December 2, 2010 transcript of Mr. Spore's deposition, I notice that Mr. Spores stated that he created a logical image of a 'specified partition' (the F partition) on the server.  This is not the same as a forensic image of all data contained on the sever.  This means that Mr. Spore imaged a 'specified' server partition and that only documents and data stored on the that partition have been preserved.

---

[24]     This Court has assumed that SMS has preserved the computers of all of these key employees or obtained a mirror image of each computer.  In the event that SMS has not taken steps to preserve all data on these computers as of March 2008 and through the August 10, 2009 (the date this suit was filed) or there has been any destruction of data on any such computer since March 2008, then SMS shall notify Zuniga and the Court in writing of this fact, and shall also conduct the same search on the deleted data on any such computer.

See Lanterman Decl., ¶ 14.

Lanterman is intimating that the SMS's search was incomplete because the image of the server was only of part of the server. However, this assertion ignores the Rule 30(b)(6) testimony of SMS as to why only the F partition was imaged. In this regard, Spore testified:

> Q. And do you have any knowledge about what the F partition constituted as opposed to any other partition on their server?
>
> A. I know that's the partition where users could save data. Other than that, I wasn't really in on any of the conversations.

See Stratton Spoliation Decl., Ex. B (Spores Dep.), p. 110. Further, Emerson confirmed that while there was a C partition and a D partition, the F partition was the only partition where data could be stored. Id., Ex. A (Emerson Dep.), p. 98.

Lanterman also took issue with the fact that the search for data on the file and print server was limited to data contained in folders with names indicative of responsive data and only involved a search of visible data and not a search of deleted data. See Lanterman Decl., ¶ 15. SMS has represented that it searched for folders with names indicative of responsive data and extracted data from user folders based on folder names indicative of relevant data for relevant custodians. See Hicks Spoliation Decl., Ex. A, ¶¶ 11-13. SMS also confirmed that it only extracted data "which was readily visible on the server at the time of the collection and not on deleted data." Id., ¶ 14. SMS used the same search methods for the July 2010 and February 2009 images. Id., ¶ 15.

This Court does not take issue with the fact that SMS only searched the server folders of key human resource custodians, given that these are areas of the server that are most likely to obtain relevant information.  However, the Court cannot comprehend why there was no search of the deleted material from the server or any search of the back-up tapes for the file and print server (similar to its review of Outlook back-up tapes) dating back to December 6, 2007, particularly when the time-period of SMS's investigation into Zuniga's allegations occurred well before the first image (February 2009) of the server.  Id., p. 21.

In light of SMS's failure to timely preserve ESI to allow Zuniga to discover relevant information bearing on the claims, defenses or subject matter of this case, SMS shall search at its own expense the deleted data from the February 2009 mirror image, using the search terms decided upon the parties or the Court, as set forth above, for Debbi Tannock, Mary Ellen Zander, Scott Mayer, James Powell, William Stesjkal, and Robert Williams.  Additionally, using these same search terms, SMS shall search the back-up tapes of the file and print server dating back to December 6, 2007, and deleted documents for the folders relating to Debbi Tannock, Mary Ellen Zander, Scott Mayer, James Powell, William Stesjkal, and Robert Williams.  On or before July 25, 2011. SMS shall produce to Zuniga all documents and data responsive to Zuniga's document requests, or within two weeks after this Court's issuance of the list of search terms.  At the same time, any documents withheld on the basis of the work product doctrine or attorney-client privilege shall be identified on a privilege log for Zuniga.

### d.      Search of Exchange Server

SMS searched the Outlook data for individuals it believed were relevant custodians; it searched the restored historical archives from back-up tapes for relevant custodians; and it searched the data from backups of stations of those individuals that had left SMS.  See Hicks Spoliation Decl., Ex. A, ¶¶ 17-20.  Recovered Outlook data was searched using a list of search terms.  See 2nd Maxwell Spoliation Decl., Ex. C (list of search terms).  SMS had identified for Zuniga a list of custodians that it believed had relevant discovery.  See Maxwell Spoliation Decl., Ex. I (July 11, 2010 email from Maxwell to Stratton and Gaulding).  In addition, the email asked Zuniga's counsel if she intended to provide a list of search terms.  Id.  There is no evidence that Zuniga asked that SMS search the records of additional custodians or suggested any additional search terms.  The list of custodians listed by SMS included those thought to be key employees by Zuniga—Tannock, Dugan, Powell, Mayer, Zander, Williams and Gonzalez.  Id.  Only William Stesjkal, as Vice President of Human Resources was not included.  While Zuniga may believe that SMS's retention or search of back-up tapes was inadequate, she has presented no evidence to support that claim.  However, consistent with this Court's previous rulings, SMS shall conduct the same search for William Stesjkal it conducted on the Exchange server for the other key employees, and on or before July 25, 2011, shall produce to Zuniga any documents that are responsive to her document requests.  At the same time, any documents withheld on the basis of the work product doctrine or attorney-client privilege shall be identified on a privilege log for Zuniga. Any request for a further search of the Exchange server is denied.

### e.   Search of Gonzalez's Work Computer

Although Gonzalez returned his SMS work computer on April 28, 2008, shortly after Zuniga's filing of EEOC charge in March 2008, SMS did not obtain control of the computer until April 2010, despite this Court's order issued in November 2009 requiring the parties to retain ESI.   In addition, the record suggests that DSi's search was inadequate.   In particular, Lanterman discovered evidence of information on Gonzalez's work computer referencing Zuniga that was not discovered during DSi's search.   Based on these facts, on or before July 5, 2011, SMS shall provide a mirror image of Gonzalez's hard drive to Lanterman for a full forensic search, including a search for documents and deleted documents, along with a search for evidence or trail of any wiping, cleaning or other utility that could delete ESI.   Due to SMS's failure to preserve Gonzalez's computer, the cost of this expert review by Lanterman will be borne by SMS. As for any documents or evidence of deleted documents discovered by Lanterman as part of his analysis, they shall first be provided to SMS so that its attorneys can review the documents for information that is privileged or covered by the work-product doctrine. SMS shall then produce any unprivileged documents found by Lanterman to Zuniga on or before July 25, 2011, along with a privilege log.   Under no circumstances shall Lanterman directly produce any documents or evidence of deleted documents to Zuniga or her counsel.

### f.   Request for Access to SMS's Servers

As a general rule, courts have resisted litigants' requests for access to their opponent's computer or other electronic devices to search for evidence.  See Powers v. Thomas M. Cooley Law School, No. 5:05-CV-117, 2006 WL 2711512 at *4 (W.D. Mich.

Sept. 21, 2006).  While Rule 34(a) requires a responding party to search its records to produce responsive data, "'Rule 34(a) does not give the requesting party the right to conduct the actual search.'"  Id. (quoting In re Ford Motor Co., 345 F.3d 1315, 1317 (11th Cir. 2003)); see also Advante Intern. Corp. v. Mintel Learning Technology, No. C 05-01022 JW (RS), 2006 WL 1806151 at *1 (N.D. Cal. June 29, 2006) (holding that the mere fact that a case involves electronic data does not change the basic concepts or rules of the discovery process; also noting that basic accusations of incomplete document production, inconsistencies, or even perjury and destruction of evidence, would no more entitle a party to look at its opponent's computer as would permitting a party to rummage through its opponent's filing cabinets and desks).  Absent some showing of improper conduct by a requesting party, other than a bald claim of failure to produce data, a requesting party will not be allowed to examine its opponent's computers.  See Powers, 2006 WL 2711512 at *4; see also Advante Intern. Corp, 2006 WL 1806151 at *1 (finding that notwithstanding the breadth of accusations a requesting party asserted, it failed to present specific, concrete evidence of concealment or destruction of evidence sufficient to conclude that an examination of its opponent's computer was warranted).

As the advisory committee's notes to Fed. R. Civ. P. 34, subd. (a) (2006 Amendments) state:

> Inspection or testing of certain types of electronically stored information or of a responding party's electronic information system may raise issues of confidentiality or privacy. The addition of testing and sampling to Rule 34(a) with regard to documents and electronically stored information is not meant to create a routine right of direct access to a party's electronic information system, although such access might be justified in some circumstances. Courts should guard

against undue intrusiveness resulting from inspecting or testing such systems.

At this juncture, the Court finds that access to and an examination SMS's servers are not warranted. First, where the evidence before this Court is that only the F partition of the server is where SMS employees could save ESI, the Court is satisfied that Zuniga is not entitled to full access to SMS's entire server to look for documents on other parts of the server. Second, while SMS's search of its servers for deleted and back-up data was not complete, there is no reason that SMS cannot comply with this Court's directives to do a complete examination as set forth above. If it is determined that SMS does not comply with this Court's directives, the Court can revisit Zuniga's request that her expert have full access to and the right to examine SMS's servers.

### g.   The Rule 30(b)(6) Deposition

Zuniga argued that SMS's corporate designees were not adequately prepared to answer questions on certain topics set forth in the Rule 30(b)(6) Deposition Notice. including SMS's search of the server or its back-up tapes, and SMS's efforts to comply with its obligations to search and preserve non-ESI ("paper") evidence. See Pl.'s Spoliation Mem., pp. 26-27, 38. In addition, Zuniga complained that SMS prohibited any discussion of what was found during the searches—specifically whether evidence of pornography was found on Gonzalez's SMS work computer. Id., pp. 21-22. SMS did not respond to these arguments in its written submissions, although its counsel represented at hearing a willingness to produce Sherry Hicks, who has provided information relating to the search of the server in support of SMS's opposition to the present motion, to testify regarding the search of the server.

There is no dispute that SMS failed to produce a Rule 30(b)(6) designee to testify regarding the retention and search for paper evidence responsive to Topics 13, 14 and 16 of the December 2, 2010 Plaintiff's *Corrected* Third Amended Notice of F.R.C.P. 30(b)(6) Depositions.  As such, SMS shall produce a Rule 30(b)(6) deponent to testify regarding to Topics 13, 14 and 16 as it relates to paper evidence.

Additionally, the Court will require SMS to produce a Rule 30(b)(6) designee to testify regarding knowledge of SMS's search of the server and its back-up tapes as relates to Topic 16.  Emerson testified that he had no involvement with analyzing the image of SMS's server once it had been captured.  See Stratton Spoliation Decl., Ex. A (Emerson Dep.), pp. 64-65.  Spore only testified as to the how the image of the corporate server was obtained (Id., Ex. B (Spore Dep.), p. 114) and Golden had no involvement with the corporate server.  Id., Ex. C (Golden Dep.), p. 7.  As such, SMS shall produce a Rule 30(b)(6) designee to testify regarding the search of the server and its back-up tapes.

As for Zuniga's request that a Rule 30(b)(6) designee be prepared to answer questions regarding whether evidence of pornography was discovered on the hard drive of Gonzalez's SMS work computer, this request is denied.  The Rule 30(b)(6) Topics address how evidence was stored, SMS's computer systems, retention and preservation of evidence, what was searched and how the searches were performed. None of the topics asked for testimony regarding what was found during SMS's searches, including evidence of pornography.[25]

---

[25]    SMS has requested that this Court find that Zuniga waived any work product protection concerning information obtain by counsel from Karla Perez, another employee who has alleged harassment by Gonzalez, when Gaulding represented in

###### 5.      Conclusion

In conclusion, this Court finds that Zuniga's motion to compel ESI, and to seek additional deposition testimony from Gonzalez and SMS regarding ESI-related issues is granted in part.

To develop the list of search terms for use in SMS's search of the hard drives of the key custodians and its print and file server, counsel for the parties shall meet and confer on or before July 11, 2011, to develop and reach agreement on a list of terms to be used in the search of the hard drives.

To the extent the parties cannot agree on the search terms to be used, they shall each submit to the Court on or before July 11, 2011, their own list of search terms, along with a letter, no more than three pages in length, setting forth why their proposed terms should be used and the other parties' list of terms be rejected.

A mirror image of Gonzalez's work computer shall be provided by SMS to Lanterman by July 5, 2011, and if Lanterman still has not retained a copy of the mirror image of Gonzalez's personal computer, Gonzalez shall provide a copy of that mirror image by July 5, 2011, as well.

In addition, SMS and Gonzalez shall submit to depositions consistent with this Order.

---

her declaration [Docket No. 338] that Perez told her that Gonzalez tried to show her pornography.  See SMS Spoliation Mem., pp. 17-18.  The request by SMS to strike the Gaulding declaration is moot given that the Court has concluded that SMS's Rule 30(b)(6) deponent is not required to discuss the content found on Gonzalez's work computer, including pornography.  To the extent that SMS is seeking a ruling from the Court that Zuniga waived the work product privilege, SMS will be required to follow Local Rule 7.1 and this Court's scheduling order in bringing its own motion to compel.

## V.     PRETRIAL SCHEDULING ORDER

In light of the additional discovery required by this Order, the parties shall meet and confer to develop a proposal for the extension of the deadlines set forth in the operative pretrial scheduling order, and shall submit that proposed schedule to the Court on or before July 11, 2011.  These proposals should include the dates by which discovery that has been required under this Order should be produced, and the dates by which the depositions of Gonzalez and SMS's Rule 30(b)(6) deponent should be completed.   To the extent the parties cannot agree on a new scheduling order, they shall each submit to the Court on or before July 11, 2011, their own proposed dates for the pretrial scheduling order, along with a letter, no more than three pages in length, setting forth why their proposed deadlines should be adopted and the other parties' dates be rejected.

J.S.M.